CALIFORNIA DEPARTMENT
OF TOXIC SUBSTANCES
CONTROL, Plaintiff,

v.

PAYLESS CLEANERS; College Cleaners; Heidinger Cleaners; Norge Village Cleaners; Cava, Inc., A California Corporation; Lobdell Cleaners; City of Chico; Norville R. Weiss; Janet L. Weiss; Paul A. Tullius; Victoria Tullius; Robert H. Heidinger; Inez N.

Heidinger; 5th and Ivy, A General Partnership; Richard C. Peters and Ramona W. Peters, Individually and as Trustees of the Peters Family Trust; Betty M. Rollag; Randall Rollag; and Tami Rollag, Defendants.

and

Related Counter–Claims.

No. S–02–2389 LKK/DA.

United States District Court, E.D. California.

March 4, 2005.

Rose B. Fua, Deputy Attorney General, Oakland, CA, for Plaintiffs Cal. Dept. of Toxic Substances Control.

David Rabbino, Resolution Law Group, Lafayette, CA, for Defendants Payless Cleaners, Norville & Janet Weiss.

James Underwood, Wilkins, Underwood & Johnson, Redding, CA, for Defendants College Cleaners, Lobdell Cleaners, and Betty, Randall & Tami Rollag.

Francis M. Goldsberry II, Goldsberry, Freeman, Guzman & Ditora, Sacramento, CA, David R. Frank, Office of the City Attorney, Chico, CA, for Defendant City of Chico.

David R. Isola, Isola Bowers, LLP, Lodi, CA, for Defendants Robert & Inez Heidinger.

Patrick Riddle, Paul D. Sheldon, of Counsel, Law Offices of Patrick Riddle, PC, Stockton, CA, for Defendant California Water Service Company.

Gary Vinson, Greve, Clifford, Wengel & Paras, LLP, Sacramento, CA, for Defendant 5th and Ivy.

Curtis Parvin, Richard Crites, Sedgwick, Detert, Moran & Arnold, LLP, Irvine, CA, for third-party Defendant Maytag Corp., as successor-in-interest to Norge Corp.

Celene M.E. Boggs, Stammer, McKnight, Barnum & Bailey, Fresno, CA, for third-party Defendant Martin Franchises, Inc.

Gordon H. Casmajor, Five Doris Way, Chico, CA, for Norge Village Cleaners & Cava, Inc.

Vartkes Vartabedian, Chico, CA, for Norge Village Cleaners & Cava, Inc.

Jan A. Greben, Joseph B. Adams, Greben & Associates, Santa Barbara, CA, for Romona W. Peters & Richard C. Peters.

## ORDER

KARLTON, Senior District Judge.

Ramona W. Peters and Richard A. Peters (the "Peters"), individually and as trustees of the Peters Family Trust, bring claims for indemnity and contribution pursuant to CERCLA, 42 U.S.C. §§ 9601 *et seq.*, as well various state law based claims against third-party defendant Maytag Corporation ("Maytag"). This matter is before the court on Maytag's motion to dismiss the Peters' Second Amended Third–Party Complaint. I decide the motion based on the papers and pleadings filed herein and after oral argument.

## I.

## BACKGROUND

This action arises out of a two-mile wide perchloroethylene ("PCE") "plume" located south of the central business district of Chico, California. On October 31, 2002, the California Department of Toxic Substances Control ("DTSC") filed a cost recovery action against various individuals and companies alleging rights under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq.* and state law based claims.[1] The DTSC named several dry cleaning businesses as well as the property owners of the sites where those businesses operated upon its belief that the PCE emanated from those businesses. Among the defendants are the Peters. The DTSC seeks to recover its costs in investigating and remediating the PCE-contaminated groundwater in the Central Plume.

The Peters are the owners of property in the City of Chico from which hazardous substances, including PCE, were allegedly released when a dry cleaner business operated on the property. DTSC FAC at 4–5. As part of their response to the DTSC's suit against them, the Peters filed a Third Party Complaint, and have now filed a Second Amended Third Party Complaint ("SAC"), against various entities. The Peters bring suit against Maytag as Norge Corporation's ("Norge") successor-in-interest, which, according to the Peters, manufactured and provided the dry cleaning equipment and PCE used on their property.[2]

## II.

## FACTS[3]

The Peters allege that, prior to their ownership, third party defendant CAVA, Inc. ("CAVA") constructed, owned, and operated Norge Village Cleaner ("Dry Cleaner") on the property at issue. SAC at 4. Pursuant to a franchise agreement, CAVA purchased and used dry cleaning machines and solvents for their dry cleaning operation from Norge, who designed and manufactured the machines and solvents. *Id.*

1. On December 31, 2002, the DTSC filed an amended complaint ("DTSC FAC").

2. The Peters allege that Norge was acquired by Magic Chef, Inc., which in turn was acquired by Maytag in 1986, becoming the successor-in interest and assuming the liabilities of Magic Chef. FAC at 3. Although Maytag does not concede that it is Norge's successor-in-interest, Maytag and Norge are used interchangeably herein for the purposes of this motion.

3. The facts set forth herein are drawn from the Peters' Second Amended Complaint ("SAC").

The dry cleaning machines were designed to use, process and discharge solvents containing PCE. *Id.* Norge also decided and controlled the layout of the Dry Cleaner, including where the machines were installed and the location of floor drains for disposal of waste water. *Id.* at 6.

According to the Peters, Norge installed the machines to use, process, and dispose of wastewater laden with PCE through a floor piping connected with the City of Chico's sewer system. *Id.* at 5.

## IV.

### STANDARD FOR DISMISSAL PURSUANT TO FED. R. CIV. P. 12(b)(6)

■ On a motion to dismiss, the allegations of the complaint must be accepted as true. See *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. See *Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 373 U.S. 746, 753 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963). Thus, the plaintiff need not necessarily plead a particular fact if that fact is a reasonable inference from facts properly alleged. See *id.; see also Wheeldin v. Wheeler*, 373 U.S. 647, 648, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963) (inferring fact from allegations of complaint).

■ In general, the complaint is construed favorably to the pleader. See *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). So construed, the court may not dismiss the complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the

claim which would entitle him or her to relief. See *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In spite of the deference the court is bound to pay to the plaintiff's allegations, however, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

## V.

### ANALYSIS

#### A. CERCLA CONTRIBUTION CLAIM

Maytag first contends that the Peters fail to allege sufficient facts to support a claim for liability under CERCLA. I examine that contention below.

■ CERCLA allocates the rights and responsibilities of those involved in hazardous waste remediation. In creating § 113(f) of CERCLA (42 U.S.C. § 9613(f)), Congress provided a right of recovery for potentially responsible parties ("PRPs") who have incurred hazardous waste cleanup costs by expressly allowing a contribution action against other PRPs.[4] Thus, a PRP who is found to be jointly and severally liable for response costs can sue to recover those expenses paid in excess of its own liability by spreading the costs to other PRPs. The Peters bring suit against Maytag for contribution in their capacity as a PRP to the DTSC.

---

4. "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title." 42 U.S.C. § 9613(f).

To establish a prima facie case against Maytag, the Peters must show that: (1) PCE is a hazardous substance; (2) there has been a release of PCE at the Peters' facility;[5] (3) the release or threatened release caused the Plaintiffs to incur response costs; and (4) defendants are within one of four classes of persons subject to CERCLA's liability provisions. *United States v. Chapman,* 146 F.3d 1166 (9th Cir.1998); *Castaic Lake Water Agency v. Whittaker Corp.,* 272 F.Supp.2d 1053, 1059 (C.D.Cal.2003). Maytag challenges only the last of these elements, asserting that it does not fall within any of the four classes as required to be held liable.

The Peters contend that they properly seek to hold Maytag liable under CERCLA because it arranged for the disposal of the PCE in question. CERCLA provides that potentially liable parties include "persons who arranged for the treatment or disposal of a hazardous substance at the facility."[6] 42 U.S.C. § 9607(a)(3).

Specifically, an arranger is:

any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3). The disposal of a hazardous substance includes the discharging, depositing, or placing of any hazardous waste into any waters.[7] 42 U.S.C. § 9601(29); 42 U.S.C. § 6903(3).

The Peters allege that Maytag "designed, manufactured, and actually installed the dry cleaning machines that produced PCE at the Dry Cleaner and/or CAVA." SAC at 6. According to them, the installation included connecting the water waste discharge piping from each of the 16 machines to the building drain, which in turn were connected to the City of Chico's sewer system. Additionally, they allege

---

**5.** The definition of "facility" includes any building, structure, pipe or pipeline (including any pipe into a sewer or publicly-owned treatment works), or any area where a hazardous substance has been deposited, disposed of, or otherwise come to be located. *See* 42 U.S.C. § 9601(9).

**6.** 42 U.S.C. 9607(a) provides:
(1) the owner and operator of a vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or

sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan.

**7.** CERCLA defines the terms "disposal" using the definition contained in the Solid Waste Disposal Act. 42 U.S.C. § 9601(29). 42 U.S.C. § 6903(3) defines "Disposal" as:

The discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

that Norge "determin[ed] the location [where] the machines were to be installed, which included specific consideration of the location of floor drains for disposal of waste water." *Id.* According to the Peters, these facts can sustain a claim of CERCLA liability because they establish that Maytag "otherwise arranged" for the disposal of the PCE.

Congress did not provide a definition for "arranged for," and CERCLA's legislative history provides little direction for interpreting the phrase. *See United States v. Aceto Agric. Chemicals Corp.*, 872 F.2d 1373, 1380 n. 8 (8th Cir.1989). There is no bright-line test to determine CERCLA arranger status, and the Circuit courts have addressed this issue in a variety of ways. The Ninth Circuit, however, has provided sufficient guidance in determining when manufacturers and vendors are arrangers under CERCLA.

### 1. *Vendor Liability*

■ The defendants maintain that they cannot be held liable as an arranger in connection with the dry cleaning machines that once operated on the Peters' property because its involvement was limited to selling a useful product. I examine this contention below.

■ The vendor of a useful product which through its normal course produces a hazardous substance, such as a battery, is not an arranger under CERCLA. *Cadillac Fairview/Cal., Inc. v. United States*, 41 F.3d 562, 566 (9th Cir.1994). For example, the sale of asbestos for building construction is not an arrangement for disposal. *3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355 (9th Cir.1990). Neither can a manufacturer of PCE be held liable as a CERCLA arranger where it has done nothing more than sell a useful chemical. *City of Merced v. Fields*, 997 F.Supp. 1326 (E.D.Cal.1998); *See also Florida Power & Light Co. v. Allis Chal-*

*mers Corp.*, 893 F.2d 1313, 1317 (11th Cir. 1990) (manufacturers of transformers containing mineral oil with a hazardous substance were not arrangers where they merely sold the transformer). A sale of a "useful product," does not establish a complete defense from arranger liability, however. If a transaction involved in the sale of a useful product includes an arrangement for the ultimate disposal of a hazardous substance, arranger liability may be found. *Id.*

The sale of a product containing hazardous waste falls somewhere between the no-liability, useful product cases, and the classic arranger situations where, for example, the owner of a hazardous substance directly disposes of it. As the Ninth Circuit explained:

> Liability is not limited to those who own the hazardous substances, who actually dispose of or treat such substances, or who control the disposal or treatment process. The language explicitly extends liability to persons "otherwise arrang[ing]" for disposal or treatment of hazardous substances whether owned by the arranger or "by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity."

*Cadillac Fairview/Cal., Inc. v. United States*, 41 F.3d 562, 565 (9th Cir.1994). Accordingly, when the alleged arranger is a seller of a product, courts are cautioned to look beyond the actual sale to determine if the disposal of a hazardous substance was arranged through the transaction. *Catellus Dev. Corp. v. United States*, 34 F.3d 748, 752 (9th Cir.1994).

While the contours of this type of arranger liability are not well-defined, the Ninth Circuit has instructed that a vendor of a product may be liable as an arranger when the disposal of waste is a 'substantial' part of the transaction. In *Cadillac Fairview,*

defendant rubber companies shipped styrene to a chemical company to remove contaminants for return shipment of clean styrene. The court ruled that a substantial part of this transaction constituted the arrangement for the disposal of a hazardous substance because, even though the companies created a useful product for sale, the removal and release of the hazardous substance was the purpose of the transaction. 41 F.3d 562 (9th Cir.1994). In *Catellus Dev. Corp. v. United States*, a vendor of spent battery parts argued that the parts were not waste because lead that would be extracted from them was a useful product. 34 F.3d 748, 751 (9th Cir.1994). The court disagreed, holding that, despite the vendor's lack of control over eventual disposal of the remaining waste, he was liable as an arranger. *Id.* at 752–53. *See also New York v. General Electric Co.*, 592 F.Supp. 291 (N.D.N.Y.1984)(a manufacturer who sold used oil containing PCB to a dragstrip which used the oil for dust control was an arranger).

In this case, the Peters do not allege any facts to support a finding that a substantial part of Maytag's sale of the dry cleaning machines involved the arrangement for the disposal of waste water. Rather, Maytag's transaction can be described only as the sale of a useful good which, through its normal use, created a waste byproduct. Under these facts alone, Maytag may not be held liable as a CERCLA arranger.

### 2. Controller Liability

Although the Peters may not bring their claim against Maytag under a theory of vendor liability, they contend that Maytag may still be held liable because it controlled the ultimate disposal of the PCE. The Ninth Circuit has held that where a party did not own or possess hazardous substances at the time of their disposal nor otherwise arranged for disposal through a transaction, it may still be held liable as an arranger where it had the authority or duty to control the disposal and actually did dispose of waste. *United States v. Shell Oil Co.*, 294 F.3d 1045, 1056–1058 (9th Cir.2002). According to the Peters, Maytag exercised the required control because it designed and installed the dry cleaning machines so that they would release dissolved PCE into the City's sewer system.

In *Shell Oil*, the court explained that, while "control is a crucial element of the determination whether a party is an arranger," that element requires the party to have had authority to control and to have exercised actual control over the disposal. In that case, oil companies sought to hold the U.S. government liable for contribution on the grounds that it controlled the arrangement of oil waste disposal. The government had assisted oil refineries in exchanging and blending various chemicals to create "avgas" fuel, which produced a hazardous waste byproduct. *Id.* at 1050. When the refineries faced a challenge in discarding the large quantities of resulting acid waste, the government attempted to solve the problem by facilitating the lease of a large storage tank. *Id.* at 1051.

The *Shell Oil* court recognized that "once an entity undertakes to arrange for disposal or treatment, it cannot abdicate responsibility when the disposal becomes infeasible." *Id.* at 1054 (internal citations omitted). The court, however, rejected the oil companies' contention that the government "had sufficient control over the process" such that it should be considered an arranger. *Id.* at 1055. Rather, it concluded that the government did not exercise the requisite control because it "never specifically ordered or approved the dumping" of the acid. *Id.* at 1051. The court provided for a narrower scope of controller arranger liability, holding that a party may be held liable on the basis of control only it

has the authority or duty to control the disposal, and when it or its agent, also exercise actual control. *Id.* at 1057–1058.

The court summarized its assessment of the "interrelationship of the factors of ownership, possession, and control over waste disposal" by quoting from Judge Levi's "careful opinion" in *United States v. Iron Mountain Mines, Inc.*, 881 F.Supp. 1432 (E.D.Cal.1995):

> It is true that some cases impose arranger liability on parties who did not literally own or physically possess hazardous waste at the time it was disposed of or released. But in each of these cases the party either was the source of the pollution or managed its disposal by the arranger. No court has imposed arranger liability on a party who never owned or possessed, and never had the authority to control or duty to dispose of, the hazardous materials at issue. *See, e.g. General Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir. 1992)("it is the obligation to exercise control over hazardous waste disposal, and not the mere ability or opportunity to control the disposal of hazardous substances that makes an entity an arranger under CERCLA's liability provision")(emphasis in original).

*Id.* at 1058 (quoting *Iron Mountain Mines, Inc.* 881 F.Supp. at 1451).

A Second Circuit opinion with a holding similar to *Shell Oil* provides further guidance. In *General Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281 (2nd Cir.1992), three PRPs leased gasoline service stations from oil companies, including an underground tank where they stored used motor oil. The PRPs brought suit against the oil companies, seeking to impose arranger contribution liability for response costs caused by tank leaks. The court ruled that the oil companies were not arrangers, however, because they did not own the waste oil and did not have authority or the duty to control the disposal of the waste. It was not enough that the oil companies provided the underground storage tank and required that the service station dealers maintain them, since the actual disposal of the waste oil was left to the dealers. *See also Jordan v. Southern Wood Piedmont Co.*, 805 F.Supp. 1575 (S.D.Ga.1992)(no arranger liability where chemical vendor provided technical bulletins including description of chemical disposal methods and communications inviting inquiries from anyone experiencing chemical problems); *compare with United States v. Northeastern Pharmaceutical & Chem. Co. ("NEPACCO")*, 810 F.2d 726, 743 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102,(1987)(plant supervisor was personally liable for arranging the hazardous waste disposal of corporation where he had authority to and actually did control disposal); *Transportation Leasing Co. v. State of California (CalTrans)*, 861 F.Supp. 931, 955 (C.D.Cal.1993) (holding municipalities liable for contracting with private companies to haul residential waste because they had duty to dispose of waste and exercised actual control over manner of disposal); *Jones–Hamilton Co. v. Beazer Materials & Services, Inc.*, 973 F.2d 688 (9th Cir. 1992) (where the defendant provided raw materials to a chemical formulator who transformed them into preservation compounds, he was an arranger because he retained ownership of the materials and explicitly allowed for a small amount of spillage of the raw materials); and *United States v. Bliss*, 667 F.Supp. 1298 (E.D.Mo.1987)(defendant who had actively participated as a broker in the disposal of its customer's waste was arranger because he had authority to and did choose the waste disposal company, thereby having control of the place and manner of disposal).

### a. Maytag's Machine Design

■ The Peters first allege that Maytag can be held liable under the 'controller theory' because it had control over the design of its dry cleaning machines and provided instructions on their use. As I explain, these facts, by themselves, are insufficient to hold Maytag liable as an arranger.

Maytag's design of the machines to produce and discharge PCE waste water and its equipment manuals requiring certain layout and drain arrangements, SAC 6, fall short of the requirements set out in *Shell Oil*. Indeed, these facts alone are analogous to the facts upon which the Ninth Circuit refused to find arranger liability, i.e. that the government recommended to the oil companies the form of waste disposal and leased a tank for that purpose. Here, Maytag's manual instructions for the machines' installation are akin to a recommendation, and not an exercise of control over the ultimate decision on how to dispose of the PCE. Although the machines were designed to discharge waste water through a hose, the Peters could have connected that hose to and collected the waste in a tank or disposed of the waste through other means. In sum, these facts do not by themselves establish Maytag's actual authority and control over the disposal of the PCE, rather, that control remained with the Peters.

### b. Order & Approval of Waste Water Discharge

■ The Peters allege a further set of facts that comes closer to the type of control required by the Ninth Circuit to establish arranger liability. According to them, Maytag not only selected the location of the machines and of the floor dis-

posal drains, but, as part of its franchise agreement, also "annually inspect[ed] the [dry cleaner] to confirm the plant layout . . . including the disposal of separator water into the sewer." SAC at 6. In other words, they contend that Maytag had actual control over the disposal of the PCE wastewater because it required management to dispose of the PCE through the sewer system. These facts, which must be accepted as true for the purpose of this motion, suggest that Maytag did authorize and approve the discharge of the waste water into the sewer system.

If Maytag chose the locations of the floor drains and then inspected to ensure that the waste water was disposed into the sewer system, then the Peters did not exercise independent decisionmaking regarding the disposal, but rather, at the very least, shared this control with Maytag. *Compare with Shell Oil*, 294 F.3d at 1051 (ruling that the government lacked the requisite arranger control because it never "specifically ordered or approved the dumping"). Although these facts alone seem sufficient to subject Maytag to arranger liability, as I explain below, the Peters present even more compelling allegations that establish Maytag's control over the PCE disposal.

### c. Installer of the Wastewater Piping

The Peters allege that Maytag physically installed the dry cleaning machines, including "physically connecting the [machines'] discharge piping" to the building drain, which was itself connected to the sewer system. FAC at 6. This fact, along with the facts concerning Maytag's role as the franchisor, establishes that it had the authority to and did actually control the disposal of the waste water laden with PCE.[8]

8. Maytag rebuts the allegation that it physically connected the waste water discharge piping to the sewer system by arguing that the instruction manual, attached to the SAC, proves the contrary. According to Maytag, the manual proves that the machines were not designed to be, and buyers were not instructed to, connect them to the sewer system.

## B. STATE LAW CAUSES OF ACTION

The Peters' SAC also contains numerous causes of action based on tort. Maytag contends that the SAC fails to allege sufficient facts upon which any of the tort claims can withstand its motion to dismiss. I examine these causes of actions below.

### 1. *Continuing Private Nuisance*

■ The Peters' SAC contains allegations which they assert amount to a claim for continuing private nuisance.

■ A "nuisance" is anything that "[i]s injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." Cal. Wat.Code § 13050(m)(1). Pollution of water constitutes a public nuisance and is further a public nuisance per se when the pollution occurred as a result of discharge of wastes in violation of Water Code §§ 13000 *et seq. Newhall Land & Farming Co. v. Superior Court,* 19 Cal.App.4th 334, 23 Cal.Rptr.2d 377 (1993); Cal. Wat.Code § 13050(m)(3). Where a public nuisance causes an injury to private property, a claim may be brought for private nuisance. *Id.* at 342, 23 Cal.Rptr.2d 377. Further, "[w]here the nuisance is abatable, it is deemed continuing, and persons harmed by it may bring successive actions for damages until the nuisance is abated." *Jordan v. City of Santa Barbara,* 46 Cal.App.4th 1245, 1256, 54 Cal.Rptr.2d 340 (1996).

■ According to the Peters, the contamination caused or permitted by Maytag constitutes a nuisance within the meaning of state law. The Peters' contention appears well-taken. In *City of Modesto Redevelopment Agency v. Superior Court,* 119 Cal.App.4th 28, 13 Cal.Rptr.3d 865 (2004), the court examined whether a manufacturer of a dry cleaning solvent could be held liable for nuisance where wastewater laden with the solvent was discharged into the sewer system. The court explained that, in California, " '[n]ot only is the party who maintains the nuisance liable but also the party or parties who create or assist in its creation are responsible for the ensuing damages.' " *Id.* at 38, 13 Cal.Rptr.3d 865 (quoting *Mangini v. Aerojet-General Corp.* 230 Cal.App.3d 1125, 1137, 281 Cal.Rptr. 827 (1991)). Nuisance liability also extends to defendants who create "a system that causes hazardous wastes to be disposed of improperly, or who instruct users" to do so. *Id.* at 40–41, 13 Cal.Rptr.3d 865 (citing *Selma Pressure Treating Co. v. Osmose Wood Preserving Co.,* 221 Cal.App.3d 1601, 271 Cal.Rptr. 596 (1990)). Again, the Peters allege that Maytag designed and installed the machines and instructed the Peters' predecessors to dispose of wastes in a manner that resulted in a public nuisance. Accordingly, the Peters' private nuisance cause of action brought to recover for the damage caused to their own private property may not be disturbed. *Id.* at 42, 13 Cal.Rptr.3d 865.

They ground their position by relying on a diagram in the manual showing a pipe connected to·an underground tank for the purpose of collecting leaking solvent. Maytag's contention is without merit. First, the Peters nowhere allege that Maytag installed the machines as illustrated in the manual, but only that the manual required that they be installed accordingly. There is no contradiction here, as the Peters may contend that Maytag didn't follow their own instructions.

Secondly, the Peters respond that the manual does in fact show that the discharge piping is to be connected to a drain, and that Maytag is attempting to confuse the court by pointing to a solvent leakage drain that is separate and distinct from the waste water drain. In any event, on the motion to dismiss, the court must accept plaintiffs' allegations as true.

## 2. *Continued Trespass*

█ The Peters further assert that Maytag may be held liable for a continued trespass based on the continuing presence of the contaminants placed in their property's soil and groundwater. Maytag rebuts that it cannot be a trespasser because it had permission to be on the property. I address these issues below.

At least one California court has rejected Maytag's position in a case with analogous factual allegations. In *Mangini v. Aerojet–General Corp.* 230 Cal.App.3d 1125, 281 Cal.Rptr. 827 (1991), the plaintiffs alleged that the defendant interfered with their right to possession of their property because they wrongfully deposited hazardous substances on it and "refus[ed] to remove them at any time since plaintiffs acquired the.. property." *Id.* at 1141, 281 Cal.Rptr. 827. Like here, the defendants maintained that the action could not be upheld because it had permission to deposit the substances. Relying on the Second Restatement of Torts [9], the court held that, although defendant might have had permission to deposit hazardous waste at the time it was discharged, the defendant was subject to trespass because that consent was withdrawn by the successor to the property and the defendant wrongfully failed to remove the waste. *Id.* It further rejected the defendant's contention that the cause of action was foreclosed because the plaintiffs did not have possession of the land when the trespass occurred, holding that "[t]he rule of continuing trespass is applicable not only where the ownership or possession of the [property] is transferred after such thing comes upon the land . . . but also where the possession of the land is transferred thereafter. . . ." *Id.* at 1142,

n. 10, 281 Cal.Rptr. 827 (quoting *Restatement Second of Torts*, comment h to § 160).

Here, the Peters claim that Maytag deposited the PCE laden wastewater on their property and that it failed to remove the contaminants after they came into possession of the land. For the reasons explained in *Mangini*, Maytag's motion to dismiss this cause of action must be denied.

## 3. *Waste*

█ The Peters further allege that, "[d]uring their occupancy of the property," Norge committed waste when it contaminated it with PCE. SAC 15. As I explain, the Peters' claim for waste cannot withstand Maytag's motion to dismiss.

█ Waste is a tort actionable for the protection of an *owner* of an interest in land. *Cornelison v. Kornbluth* 15 Cal.3d 590, 597–598, 125 Cal.Rptr. 557, 542 P.2d 981 (1975). The tort of "[w]aste evolved and broadened from a cause of action designed to protect owners of succeeding estates against the improper conduct of the person in possession which harmed and affected the inheritance." *Smith v. Cap Concrete, Inc.,* 133 Cal.App.3d 769, 775, 184 Cal.Rptr. 308 (1982). To constitute waste, there must be an injury to the party's future ownership interest. *Id.; Smith v. Cap Concrete, Inc.,* 133 Cal. App.3d 769, 775, 184 Cal.Rptr. 308(1982). Because the Peters did not own a property interest in the land at the time when the waste was allegedly committed, this cause of action necessarily fails.

## 4. *Strict Products Liability*

**9.** Section 160 of the Second Restatement of Torts provides that:

"[a] trespass may be committed by the continued presence on the land of a . . . thing which the actor or his predecessor in

legal interest has placed on the land '(a) with the consent of the person then in possession of the land, if the actor fails to remove it after the consent has been effectively terminated . . . .' "

The SAC also seeks to hold Maytag liable on a claim of strict products liability. In California, a manufacturer is strictly liable when it places a product on the market, knowing that it will be used without inspection and it causes damage to property. *Sacramento Regional Transit Dist. v. Grumman Flxible,* 158 Cal.App.3d 289, 204 Cal.Rptr. 736 (1984) (abrogated on other grounds). According to the Peters, Maytag designed, manufactured, distributed, sold, and installed the machines to use and process chlorinated solvents and represented that the solvents and machines could be used without causing injury or damage. SAC 8. The contend that Maytag failed to adequately warn its customers that the water coming from the dry cleaning machines contained dissolved PCE and that its disposal to the sewer would result in harm. Opp'n to Mot. To Dismiss at 15. Maytag should have known, they claim, that the defects of the products could not have been discovered with reasonable diligence, and that the products, even when used in their foreseeable and intended manner, would cause damage. SAC at 8–9.

To support its motion to dismiss this claim, Maytag argues only that Norge's manual disproves the Peters' allegations because it shows that the machine was not designed in the manner alleged by them. As such, they contend, the manual "trumps" the alleged facts and forecloses a strict products liability cause of action. As explained above, Maytag's position fails because the manual does not necessarily contradict the Peters' claims. Further, even if there was an issue of factual dispute, that question would have to be addressed at a later stage. For now, the Peters have presented sufficient allegations to withstand the motion to dismiss.

### 5. *Negligence*

The Peters also present a cause of action for negligence based on their allega-

tions that Maytag knew or should have known that the foreseeable use of the dry cleaning machines at issue would cause injury. SAC at 11. According to the Peters, Maytag violated its duty of care when it failed to warn and disclose the harm.

Maytag defends itself by asserting that there is no allegation that Maytag actually operated the dry cleaning facility and discharged the PCE itself. It does not dispute, however, and therefore effectively concedes, that it may be held liable pursuant to the allegations that it designed and installed the dry cleaning machines so that the PCE would discharge into the sewer system. Accordingly, the motion to dismiss this cause of action will also be denied.

### 6. *Negligence Pe Se*

Maytag also seeks to dismiss the Peters' negligence per se cause of action. The Peters base this cause of action upon their claim that Maytag's acts, as alleged, were violative of the Health & Safety Code, the state Water Code, and the Fish & Game Code. SAC 12.

To state a cause of action pursuant to the negligence per se doctrine, the plaintiff must show that (1) the defendant violated a statute or regulation, (2) the violation caused the plaintiff's injury, (3) the injury resulted from the kind of injury the statute or regulation was designed to prevent, and (4) the plaintiff was a member of the class of persons it was intended to protect. *Alejo v. City of Alhambra,* 75 Cal.App.4th 1180, 1184–85, 89 Cal.Rptr.2d 768 (1999).

According to Maytag, the Peters fail to meet the first element because the manufacture and sale of the dry cleaning machines at issue did not violate any of the cited statutes. As the Peters point out, however, Maytag ignores the allegations that Maytag's installation of the machines

violated these statutes which prohibit the discharge or release of wastes and causing contamination. Contrary to Maytag's contentions, the SAC sufficiently states a cause of action for negligence per se.

### 7. *Injury*

Finally, I pause to address a question that, although left unaddressed by defendant, merits the court's attention. Although, as explained above, the majority of the Peters' tort claims withstand the challenges presented by Maytag, the court must examine whether the Peters sufficiently allege damages or injury as required to pursue these claims.

 In California, plaintiffs may seek remedies for strict liability and negligence only for physical injury to person or property, and not for pure economic losses. *Seely v. White Motor Co.,* 63 Cal.2d 9, 18–19, 45 Cal.Rptr. 17, 403 P.2d 145 (1965); *see also Sacramento Regional Transit Dist. v. Grumman Flxible,* 158 Cal.App.3d 289, 204 Cal.Rptr. 736(1984). Economic damages are defined as "damages for inadequate value, costs of repair and replacement of [a] defective product or consequent loss of profits—without any claim of personal injury or damages to other property...." *Sacramento Regional Transit,* 158 Cal.App.3d at 294, 204 Cal.Rptr. 736. Pure economic damages result when a plaintiff fails "to allege physical injury to its property apart from the manifestation of the defect itself." *Id.* at 294, 204 Cal. Rptr. 736. Therefore, unless physical injury occurs, a plaintiff cannot state a cause of action for strict liability or negligence. As I explain, the Peters sufficiently plead physical injury to sustain their strict liability and negligence tort causes of action.

 While the Peters cannot claim that their property suffered injury by the mere presence of the PCE, there is cognizable physical damage to their property because the substance contaminated the property. *San Francisco Unified School Dist. v. W.R. Grace & Co.,* 37 Cal.App.4th 1318, 1327, 44 Cal.Rptr.2d 305 (1995)("asbestos [actually] contaminating a building constitutes a physical injury compensable under tort law," whereas a loss of the fair market value of buildings containing asbestos is a pure economic injury). The Peters clearly allege that the PCE contaminated the soil on and beneath their real property. Accordingly, if they ultimately prevail on their claims, they may recover for the damage caused to their own property.

## VI.

## CONCLUSION

For the reasons discussed above, the Court ORDERS that defendant Maytag's motion to dismiss is GRANTED as to third-party plaintiff's waste cause of action and DENIED in all other respects.

IT IS SO ORDERED.