**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SECURITIES AND EXCHANGE
COMMISSION,
               *Plaintiff-Appellant,*

    v.

JOHN J. TODD; ROBERT D. MANZA;
JEFFREY WEITZEN,
             *Defendants-Appellees.*

No. 07-56098

D.C. No.
CV-03-02230-BEN

SECURITIES AND EXCHANGE
COMMISSION,
               *Plaintiff-Appellee,*

    v.

JOHN J. TODD,
           *Defendant-Appellant,*
    and

ROBERT D. MANZA; JEFFREY
WEITZEN,
                *Defendants.*

No. 07-56193

D.C. No.
CV-03-02230-BEN

SECURITIES AND EXCHANGE
COMMISSION,
                    *Plaintiff-Appellee,*

                    v.

JOHN J. TODD,
                    *Defendant,*                    No. 07-56196

JEFFREY WEITZEN,                                    D.C. No.
                    *Defendant,*                    CV-03-02230-BEN

                    and                             OPINION

ROBERT D. MANZA,
                    *Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted
November 5, 2010—Pasadena, California

Filed June 23, 2011

Before: Mary M. Schroeder, Richard C. Tallman, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

---

## COUNSEL

Randall Quinn, Assistant General Counsel, Washington, D.C., for plaintiff-appellant Securities and Exchange Commission.

Vincent J. Brown and Robert D. Rose, Sheppard, Mullin, Richter & Hampton, LLP, San Diego, California, for defendant-appellee John J. Todd; James L. Sanders, McDermott Will & Emery, LLP, Los Angeles, California for defendant-appellee Robert D. Manza; Matthew E. Sloan, Skadden, Arps, Slate, Meagher & Flom, LLP, Los Angeles, California for defendant-appellee Jeffrey Weitzen.

---

## OPINION

M. SMITH, Circuit Judge:

The Securities and Exchange Commission (SEC) brought suit against senior officers of Gateway Incorporated (now a subsidiary of Acer, Inc.) claiming that they unlawfully misrepresented Gateway's financial condition in the third quarter of 2000 in order to meet financial analysts' earnings and revenue expectations. After a three-week trial, a jury found two

former Gateway financial executives, John J. Todd and Robert D. Manza, liable on all claims by the SEC.

The SEC appeals the district court's order granting, in part, Todd's and Manza's motions for judgment as a matter of law, following the jury verdict. The SEC also appeals the district court's order granting the motion by Jeffrey Weitzen, former Gateway President and CEO, for summary judgment concerning certain alleged securities violations. On cross-appeal, Todd and Manza appeal the district court's order denying in part their motions for judgment as a matter of law, and denying their motions for a new trial.

We affirm in part, reverse in part, and remand. We reverse the district court's order granting in part Todd's and Manza's motions for judgment as a matter of law on the antifraud claims under the Securities Exchange Act of 1934 Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and misrepresentation to auditors claims under Rule 13b2-2(a)(1), 17 C.F.R. § 240.13b2-2. Substantial evidence supports the jury's verdict that Todd and Manza at least recklessly misrepresented revenue related to the Lockheed transaction, and that Todd recklessly misrepresented revenue as to the VenServ transaction, in the third quarter of 2000.

We also reverse the district court's order granting Weitzen's motion for summary judgment as to the Section 10(b) and Rule 10b-5 violations because there are genuine issues of material fact regarding whether Weitzen knowingly misrepresented Gateway's financial growth as "accelerated" given his knowledge of the unusual Lockheed and AOL transactions. There are also issues of material fact as to whether Weitzen was a "control person" under Section 20(a), 15 U.S.C. § 78t(a). We affirm the district court's order granting Weitzen's motion for summary judgment as to the Rule 13b2-2 claim because there is no evidence that Weitzen signed a letter to Gateway's auditors knowing that it misrepresented Gateway's financial position.

We also affirm the district court's order denying in part Todd's and Manza's motions for judgment as a matter of law on the aiding and abetting claims under Sections 13(a), 15 U.S.C. § 78m(a), 13(b)(2)(A), 15 U.S.C. § 78m(b)(2)(A), and Rule 13b2-1, 17 C.F.R. § 240.13b2-1, and their motions for a new trial.

## BACKGROUND FACTS AND PRIOR PROCEEDINGS

### I. Gateway's Officers and Transactions

Gateway is a manufacturer and seller of personal computers. In 2000, Weitzen was Gateway's president and chief executive officer (CEO), Todd was its chief financial officer (CFO), and Manza was its controller. In addition to maintaining its own internal accounting systems, Gateway retained PricewaterhouseCoopers (PwC) as its outside accounting and auditing firm.

Todd was responsible for Gateway's financial reporting, which included reviewing and signing financial reports. Todd also reviewed press releases, made accounting decisions, and managed Gateway's relationships with outside auditors and investors. Manza was the company's highest-ranking CPA. His responsibilities included booking transactions and preparing financial statements, such as Gateway's 10-Q (quarterly) and 10-K (yearly) reports.

Todd and Manza signed the third-quarter 2000 management representation letter to PwC, which claimed that Gateway's quarterly financial statements were a "fair presentation" of Gateway's financial position, and that they were prepared in "conformity with generally accepted accounting principles [GAAP]." Also in the third quarter of 2000, Weitzen and Todd represented in a conference call with analysts that Gateway was experiencing "accelerating revenue growth." Weitzen also participated in preparing a press

release claiming that Gateway had "accelerated year-over-year revenue growth."

In 2000, the personal computer market was weakening substantially, yet Gateway continued to claim record earnings and revenue growth. Skeptical, the SEC began investigating whether Weitzen, Todd, or Manza had misrepresented Gateway's financial condition during the second and third quarters of 2000 in order to meet Wall Street analysts' expectations. In the SEC's view, Weitzen, Todd, and Manza had misrepresented Gateway's financial status in order to cover a $110 million gap in the third quarter between the analysts' expectations and its actual revenue. Three transactions are at issue in this appeal.[1]

## A.    The Lockheed Transaction

In the third quarter of 2000, Gateway recorded $47.2 million in revenue from a sale of fixed assets to Lockheed Martin. Contrary to Gateway's customary practice of selling Gateway-branded personal computers, the sale was mostly comprised of IBM and Sun servers. The essence of the transaction was that Lockheed would acquire the equipment for $47.2 million, and Gateway would lease it back from Lockheed. The deal was to be cash neutral for Lockheed.

The parties agree that this was an unusual transaction because Gateway normally sold its own computers to consumers from its inventory, whereas this was a one-time trans-

---

[1]The SEC challenged four transactions at trial as to Todd and Manza. Because the jury verdict was written in the disjunctive, the SEC need only demonstrate that one of the transactions was supported by substantial evidence. *See McCord v. Maguire*, 873 F.2d 1271, 1273-74 (9th Cir.), *amended by* 885 F.2d 650 (9th Cir. 1989). We therefore primarily focus our analysis on the two claims most strongly supported by the evidence at trial, the Lockheed transaction, and the VenServ transaction as to Todd only. We express no opinion concerning the two unaddressed claims or the VenServ transaction as to Manza.

action involving fixed assets manufactured by other companies. Gateway booked the sale of the fixed assets as gross revenue. Thereafter, the $47.2 million transaction was publicly reported as gross revenue in Gateway's Form 10-Q report, the third-quarter earnings release, and in a conference call with analysts.

At trial, the parties disputed whether Gateway's booking of the transaction as revenue violated GAAP. They also clashed over whether the booking was at odds with the policy disclosed in Gateway's 1999 Form 10-K report, in which Gateway indicated that fixed-asset sales would be included as gains or losses in net income, whereas product sales and services would be recorded as gross revenue. What no one disputes is that absent the $47.2 million in revenue booked by Gateway from the Lockheed transaction, Gateway would not have met analysts' quarterly expectations.

## B.   The VenServ Transaction

Gateway's third-quarter earnings in 2000 also included $21 million derived from an incomplete sale of computers to VenServ, booked as revenue. The sale was incomplete because, according to a referral agreement, VenServ was not required to pay Gateway for the computers until Gateway referred enough customers to VenServ to buy them. Because Gateway had not yet referred the requisite number of customers to VenServ, the sale could not properly be recorded as revenue. None of the parties presently disputes the fact that the VenServ sale was improperly booked.

## C.   The AOL Transaction

In the third quarter of 2000, Gateway and AOL contractually changed the timing of when fees were payable by AOL to Gateway. Prior to the change, AOL agreed to pay a fee to Gateway whenever a buyer of a Gateway computer registered with AOL. Under the modified agreement, the AOL fees were

payable as soon as a Gateway computer was shipped to a customer, permitting Gateway to book revenue upon shipment. While the transaction itself was not improper, it gave Gateway a one-time revenue boost of $72 million. The SEC claimed that Weitzen misrepresented Gateway's growth as "accelerated" in the conference call with analysts and in a press release when he did not disclose that the third-quarter revenue was based in part on this unusual, one-time transaction, rather than on ordinary sales growth.

## II.   Prior Proceedings

On November 13, 2003, the SEC filed a civil enforcement complaint alleging that Weitzen, Todd, and Manza had violated various securities antifraud and reporting provisions under the Securities Act of 1933, 15 U.S.C. § 77a, et seq., and the Securities Exchange Act of 1934 (Act), 15 U.S.C. § 78a, et seq. On May 30, 2006, the district court granted Weitzen's motion for summary judgment as to (1) the antifraud provisions of Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; (2) the Rule 13b2-2 prohibition against making misrepresentations to auditors, 17 C.F.R. § 240.13b2-2; and (3) control person liability under Section 20(a), 15 U.S.C. § 78t(a).

On March 7, 2007, after a three-week trial, the jury handed down a verdict against Todd and Manza on all claims against them. On May 30, 2007, the district court granted Todd's and Manza's motions for judgment as a matter of law and set aside the jury verdict on most claims, including, in relevant part, the Section 10(b) and Rule 10b-5 misrepresentation provisions, and the Rule 13b2-2 prohibition against making misrepresentations to auditors. The district court denied Todd's and Manza's motions to set aside the verdict on the Section 13(a) and (b) aiding and abetting and reporting violations. The SEC, Todd, and Manza appeal and cross-appeal.

## STANDARDS OF REVIEW AND JURISDICTION

We review a district court's summary judgment ruling de novo. *FTC v. Stefanchik*, 559 F.3d 924, 927 (9th Cir. 2009). "We view the evidence in a light most favorable to the non-moving party and decide whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Id*.

We also review the district court's grant of judgment as a matter of law de novo. *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997). A jury's verdict must be upheld if it is supported by "substantial evidence." *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007) (citation and internal quotation marks omitted). The court must not weigh the evidence, but rather should ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion. *See Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227-28 (9th Cir. 2001). The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party. *Id*. at 1227.

We have jurisdiction pursuant to 28 U.S.C. § 1291.

## DISCUSSION

### I.  The Section 10(b) and Rule 10b-5 Verdict Against Todd and Manza

Section 10(b) of the Act provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce . . . To use or employ, in con-

nection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 further delineates that it is unlawful

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

**[1]** Liability under Section 10(b) and Rule 10b-5 therefore requires evidence of (1) a material misrepresentation, (2) in connection with the purchase or sale of a security, (3) with scienter, (4) by means of interstate commerce. *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855-56 (9th Cir. 2001) (citing *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993)). For a misrepresentation to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation and internal quotation marks omitted).

Scienter is the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Reckless conduct may also constitute scienter. *Dain Rauscher, Inc.*, 254 F.3d at 856. Reckless conduct is a highly unreasonable act or omission that is an "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (citation and internal quotation marks omitted).

The jury found Todd and Manza liable for securities fraud under Section 10(b) and Rule 10b-5. Only the material misrepresentation and scienter elements of the claimed 10(b) violations are disputed on appeal. We reverse the district court's grant of judgment as a matter of law because substantial evidence supports the jury's verdict concerning Todd and Manza.

## A.   The Lockheed Transaction

### 1.   Material Misrepresentation

The district court granted Todd's and Manza's motions for judgment as a matter of law, reasoning that the SEC's expert, Professor Arnold, did not cite a specific GAAP provision prohibiting the booking of revenue from the sale of fixed assets, and that Manza had disclosed this unusual transaction to PwC. The SEC argues that substantial evidence supports the jury's verdict because Professor Arnold and other witnesses testified at trial that Todd and Manza misrepresented the financial statements for the Lockheed transaction by knowingly recording the revenue improperly under GAAP, and by failing to disclose a material change in Gateway's accounting practices.

**[2]** We recognize that GAAP "tolerate[s] a range of 'reasonable' [accounting] treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v.*

*Comm'r of Internal Revenue*, 439 U.S. 522, 544 (1979). Fraudulent accounting decisions are "not merely the difference between two permissible judgments," as flexible accounting concepts "do not always (or perhaps ever) yield a single correct figure." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) (en banc), *superseded by statute on other grounds as recognized in Ronconi v. Larkin*, 253 F.3d 423, 429 n.6 (9th Cir. 2001); *see also Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1020-21 (5th Cir. 1996) (explaining that GAAP encompasses "a wide range of acceptable procedures, such that 'an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement' ") (citation omitted).

**[3]** Here, the parties presented competing expert testimony concerning the propriety of Gateway's accounting treatment of the Lockheed transaction. Todd and Manza justified their treatment of the Lockheed transaction by relying on GAAP's Statement of Financial Accounting Concept #6, which defines revenue as "inflows or other enhancements of assets or an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities that constitute the entity's ongoing major or central operations." According to the defense, because Gateway ordinarily sold computer equipment as part of its central operations, Gateway could properly recognize the revenue even though it was generated by the sale of a "fixed asset" rather than the sale of inventory.

**[4]** On the other hand, substantial evidence was presented to the jury that enabled it to properly find that GAAP did not permit Gateway to book the Lockheed transaction as it did. The SEC's expert testified at trial that, based on his reading of Concept #6, it was inappropriate to consider the sale as revenue generating because "no company sells its fixed assets on a regular basis" unless "it's liquidating." Additionally, the

defense expert conceded that in his entire career as an auditor he had never seen a fixed-asset sale recorded as revenue.

Assessing expert witness credibility is within the province of the jury. *See, e.g.*, *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1196 (9th Cir. 2005) ("If two contradictory expert witnesses can offer testimony that is reliable and helpful, both are admissible and it is the function of the finder of fact, not the trial court, to determine which is the more trustworthy and credible." (citation and alterations omitted)). Here, the jurors were presented with competing expert testimony about the propriety of the accounting treatment, and they were at liberty to choose which testimony they found more credible.

**[5]** Moreover, technical compliance with GAAP does not preclude a finding that an accounting treatment was a material misrepresentation. *See, e.g., United States v. Sarno*, 73 F.3d 1470, 1482 n.6 (9th Cir. 1995) ("Adherence to GAAP would obviously qualify as weighty exculpatory evidence; it does not, however, necessarily shield one from [ ] liability.") (citing *United States v. Weiner*, 578 F.2d 757, 785-86 (9th Cir. 1978)); *Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir. 1994) (same). Regardless of whether Gateway's accounting treatment of the Lockheed transaction technically complied with GAAP, there was evidence to support a finding that booking the transaction as revenue was nonetheless materially misleading to investors. The SEC proffered the testimony of other witnesses at trial who claimed that it was unreasonable to record the transaction as revenue. For example, McLaughlin, a partner from PwC, testified that "there was no basis to record a sale of fixed assets as revenue in GAAP." Foote, a PwC manager, testified that she was "surprised, shocked" that the transaction was recorded as revenue. Manza himself, while stating that he eventually grew comfortable with the idea, also testified that if he were CFO, he would not have recognized the transaction as revenue generating. Other Gateway employees—Bird, head of Gateway's consumer division;

Richard, a Gateway manager; and Paustian, a Gateway CPA —all testified that they would not have recognized the proceeds of the Lockheed transaction as revenue. Collectively, this testimony constitutes substantial evidence that the jury was entitled to credit in reaching its verdict. *See United States v. Reyes*, 577 F.3d 1069, 1076 (9th Cir. 2009) (holding that the witnesses' cumulative testimony, viewed in the light most favorable to the prosecution, was sufficient to support the jury's finding of material omissions and misstatements) (citing *United States v. Gonzalez-Torres*, 309 F.3d 594, 598 (9th Cir. 2002)).

**[6]** Furthermore, evidence was also introduced showing that Gateway's internal policies, which had been disclosed to investors, were violated. For example, there was evidence that booking the Lockheed transaction as revenue was contrary to Gateway's accounting policy of recording fixed-asset sales as gains or losses, rather than as revenue. Gateway's accounting policy for fixed assets was stated in its 1999 Form 10-K report, and neither Todd nor Manza disclosed a change to that policy in Gateway's third-quarter 10-Q report. For these reasons, we conclude that the jury relied on substantial evidence in finding a material misrepresentation concerning improper and misleading accounting for the Lockheed transaction.

## 2. Scienter

**[7]** The district court found that there was insufficient evidence to establish scienter as to Todd and Manza because PwC was informed of the unusual Lockheed transaction. However, evidence was introduced showing that Todd instructed Manza not to tell PwC that Gateway had recognized the $47.2 million as revenue after Manza had voiced concerns that "the auditors wouldn't go for" it;[2] and that Todd

---

[2]Todd objected at trial to the introduction of the statement that he instructed Manza not to tell PwC and continues to argue that the statement is inadmissible hearsay. However, Todd does not provide any analysis as

and Manza did not tell PwC that Gateway had already recognized the $47.2 million as revenue when they informed PwC of the Lockheed transaction or seek an opinion from PwC concerning whether the Lockheed transaction could properly be booked as revenue. Thus, while PwC learned about the Lockheed transaction in a timely manner, it only learned that the transaction had been treated as revenue component in January 2001, after the third-quarter numbers had been posted and reported in Gateway's 10-Q report. Moreover, once it learned about how Gateway had treated the Lockheed transaction, PwC did not "go for it," and Gateway ultimately restated the transaction.

**[8]** A jury could reasonably find that Todd and Manza's actions delayed PwC's discovery that $47.2 million had been recorded as revenue until after the release of the third-quarter numbers, and that the failure to disclose the accounting treatment in the fall of 2000 for this unusual transaction was a significant departure from the standards of ordinary care and presented a danger of misleading buyers and sellers as to Gateway's actual financial status. Considering the foregoing evidence, we conclude that there was substantial evidence for the jury to find at least recklessness, and therefore scienter, on the part of Todd and Manza.

_____

to why the district court purportedly abused its discretion in permitting the testimony at trial. *See Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 776 (9th Cir. 2010) ("We review the admission of evidence under an exception to the hearsay rule for abuse of discretion.") (citation and internal quotation marks omitted); *see also, e.g.*, *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("We will not manufacture arguments for [a party]. . . ."). Moreover, because there is sufficient other evidence in the record, including Manza's own testimony, from which a jury could reasonably infer that Todd and Manza knew that recording the Lockheed transaction as revenue was problematic, but still did not fully disclose to PwC the accounting treatment in fall 2000, there is no prejudice. *See McEuin v. Crown Equip. Corp.*, 328 F.3d 1028, 1032 (9th Cir. 2003).

### B.   The VenServ Transaction

**[9]** The parties now agree that revenue from the VenServ transaction was improperly recognized in the third quarter of 2000. Because Gateway's sale of computers to VenServ was incomplete, it was improper to record the $21 million in revenue for the sale. The issue before us on appeal is whether there was substantial evidence to permit a jury to find that Todd acted with scienter when the transaction was improperly recorded. We conclude that there was.

**[10]** Generally, a GAAP violation is insufficient, without more, to support a finding of scienter. *In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994); *see also In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) ("[W]hile scienter cannot be established by publishing inaccurate accounting figures, even when in violation of GAAP, significant violations of GAAP standards can provide evidence of scienter." (citation omitted)).

**[11]** Here, there is additional evidence in the record that Todd understood that the VenServ transaction was not a complete sale, and therefore acted recklessly by improperly recording revenue that they knew was not yet realized. Todd knew the terms of the VenServ agreement and that it was not yet a complete sale. The referral agreement outlined the terms of the transaction, and specified that the sale would be considered incomplete until a sufficient number of customers were referred to VenServ by Gateway. Even though Todd did not directly admit at trial that he signed the referral agreement, he acknowledged that the signature on the referral agreement could have been his, and the jury was able to compare the signature on the referral agreement with other examples of his signature in order to determine that he signed the agreement. *See, e.g.*, *United States v. Jenkins*, 785 F.2d 1387, 1395 (9th Cir. 1986). The jury could also reasonably conclude that Todd knew and agreed with the terms of the referral agreement.

Indeed, evidence was introduced showing that Todd knew that Gateway was obligated to refer customers to VenServ.

**[12]** Other evidence suggested that Todd knew that the VenServ sale was not complete. He was informed that, to fill a Gateway order, Gateway had removed computers allegedly sold to VenServ from a separated area of Gateway's warehouse used to store VenServ purchases. He also approved the immediate booking of the revenue from the VenServ sale even though VenServ was given a four-month extension to pay for the computers. Because there was sufficient evidence to support a finding that Todd knew that the VenServ sale was incomplete, but was nevertheless included in Gateway's quarterly revenue, the jury could properly infer at least recklessness on Todd's part. Accordingly, we conclude that the jury reasonably could have found that Todd acted with scienter as to the improper treatment of the VenServ transaction.

## II.   Todd's and Manza's Rule 13b2-2 Liability for Improper Reporting to Accountants

The SEC contends that Todd and Manza violated Rule 13b2-2 by signing and submitting to PwC the management representation letter for the third quarter of 2000, which falsely stated that the financial statements were prepared in accordance with GAAP.

**[13]** Rule 13b2-2(a)(1) provides that "[n]o director or officer of an issuer shall, directly or indirectly . . . [m]ake or cause to be made a materially false or misleading statement to an accountant." 17 C.F.R. § 240.13b2-2. To be liable, one must "knowingly" make false statements. *United States v. Goyal*, 629 F.3d 912, 916 n.6 (9th Cir. 2010) ("[L]iability under Rule 13b2-2 . . . requires that a false statement to an auditor be made knowingly."). "Knowledge requires that [the defendant] 'was aware of the falsification and did not falsify through ignorance, mistake, or accident." *Id.* at 916 (quoting *Reyes*, 577 F.3d at 1080).

The trial court granted Todd's and Manza's motions for judgment as a matter of law on the Rule 13b2-2 claim because it concluded that neither Todd nor Manza knew that the management representation letter to PwC that they signed was false.

**[14]** The SEC urges us to find that the district court impermissibly grafted a scienter requirement onto the rule by requiring Todd and Manza to know that they were falsely signing the management representation letter. The district court properly applied a "knowing" standard, which the SEC fails to distinguish from intent to mislead. *See, e.g.*, *United States v. Watkins*, 278 F.3d 961, 968-69 (9th Cir. 2002) (explaining that mere knowledge of falsity does not suffice to prove intent to mislead). The SEC acknowledges that the rule does not create a "strict liability" regime. Rather, the SEC seeks to impose a standard closer to negligence or reasonableness. However, we cannot relax the standard from the statutory command, as it would impose liability on a broader range of conduct than Congress intended. *See Goyal*, 629 F.3d at 916 n.6. Accordingly, while we acknowledge that the district court applied the appropriate rule—the requirement that the defendants knowingly submit false reports—we disagree with the district court's application of the rule to the facts of this case. There is sufficient evidence that Todd and Manza had scienter with respect to the Section 10(b) violations, and therefore knew that the management representation letter they signed was false, in violation of Rule 13b2-2. Therefore, we reverse as to this claim.

## III.  Weitzen's Motion for Summary Judgment

The SEC contends that the district court erred in granting summary judgment in favor of Weitzen because: (1) there were genuine issues of material facts as to Weitzen's direct liability under Section 10(b) and Rule 10b-5; (2) the court applied the wrong legal standard for determining "control per-

son" liability under Section 20(a); and (3) the court erred in applying Rule 13b2-2.

## A.   The Section 10(b) and Rule 10b-5 claims for securities fraud

The SEC contends that there are genuine issues of material fact as to whether Weitzen misrepresented Gateway's revenue growth in the third quarter of 2000 as "accelerated." The SEC argues that Weitzen failed to publicly disclose in an analysts' conference call and an earnings press report that Gateway's ability to meet analysts' revenue growth expectations was based largely on the one-time Lockheed and AOL transactions. Only the material misrepresentation and scienter elements of the SEC's claim are in dispute in this appeal. We agree with the SEC that there are genuine issues of material fact, precluding summary judgment, as to these elements.

### 1.   Material Misrepresentations

The SEC contends that Weitzen made material misrepresentations in the conference call with analysts and the earnings press report by characterizing Gateway's growth as "accelerated," when the reality was that Gateway only met financial analysts' expectations because of the one-time Lockheed and AOL transactions.[3] The Lockheed transaction resulted in Gateway booking $47.2 million in revenue from the sale of fixed-asset, non-Gateway branded computers and servers to Lockheed. The AOL transaction resulted in a one-

---

[3]The SEC moved for summary judgment against Weitzen on the Lockheed and AOL transactions, as well as Gateway's increase in high-risk consumer lending, but only appeals the Lockheed and AOL transactions. The VenServ transaction was not considered in the Weitzen summary judgment, but was a focus in the Todd-Manza trial. Likewise, the AOL transaction was not a focus of the Todd-Manza trial. Accordingly, only the effect of the Lockheed and AOL transactions are considered on appeal regarding the motions for summary judgment.

time revenue increase of $72 million to Gateway based on a change in the way AOL paid fees to Gateway.

Generally, "whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995); *see also Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987) (stating that adequacy of disclosure is normally a jury question). Accordingly, resolving an issue as a matter of law is only appropriate when the adequacy of the disclosure is "so obvious that reasonable minds [could] not differ." *Durning*, 815 F.2d at 1268; *accord TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).

**[15]** Information regarding a company's financial condition is material to investment. *Reyes*, 577 F.3d at 1076 (citing *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) ("Surely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge.")). Moreover, how officers and directors of a public corporation describe revenue growth to investors is important. *See Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001). We have explained,

> The statement that "sales growth was accelerating," . . . is material and descriptive of historical fact, rather than forward looking. The statement that "growth" is "accelerating" means that a graph of sales against time shows a concave line. Prospective investors deciding whether a business is doing well look at whether sales revenue is flat, increasing, or declining, and if it is increasing or declining, whether the change appears to be accelerating or flattening out. Sales that are not only growing, but growing faster and faster, matter to an investor.

*Id*. at 430-31; *see also United States v. Ebbers*, 458 F.3d 110, 116, 126 (2d Cir. 2006) (holding that a "gap closing" program

that included as revenue several new "largely one-time items not previously counted in revenue," violated Section 10(b) because investors "would not have been alerted to the fact that revenue as previously calculated was actually down").

[16] Here, a rational trier of fact could find that Weitzen misled investors by publicly describing Gateway's growth as "accelerated" without simultaneously disclosing the unusual nature of the Lockheed and AOL transactions. There is evidence in the record showing that Weitzen participated in the "gap filling" program that led to the two transactions. Weitzen testified that he "understood where the individual [business] units were and what they were going to try to do to close the gaps." These two gap fillers were unusual sources of revenue for Gateway. The Lockheed transaction was unusual because it was a sale of fixed assets, whereas Gateway mainly sold computers to consumers from its inventory. The AOL revenue was also atypical because it was from a one-time advanced payment based on a change in the terms of the contract between Gateway and AOL.

The record further demonstrates that Weitzen understood that the transactions were significant and that the revenue gap would not have been closed without them. Weitzen testified that he understood that the Lockheed transaction, which was cash neutral to Lockheed, involved an unusually large sale of non-Gateway IT hardware, and that he was not aware of any large P.C. inventory sales at the end of the quarter that were used for "gap filling." Weitzen also thanked AOL's president —who acknowledged that the revised AOL contract deal would allow Gateway "to take top line rev[enues]"—for providing Gateway with "favorable accounting treatment. It's helping us." Viewed in the light most favorable to the SEC, a rational trier of fact could reasonably infer from these facts that the two unusual transactions were the primary reason why Gateway met analysts' expectations, and that they did not fall within Gateway's traditional core business model of selling to consumers.

Despite his understanding of the true nature of the Lockheed and AOL transactions, however, Weitzen publicly stated in the conference call with analysts that Gateway was "experiencing accelerating revenue growth" and further explained that Gateway's growth in 2000, compared to 1999, demonstrated that "[w]e've had acceleration of revenue growth." Weitzen also substantially participated in preparing Gateway's press release for the third quarter of 2000, which claimed that Gateway had "accelerated year-over-year revenue growth." Weitzen contrasted Gateway's financial success with the rest of the industry, which was facing "troubling news." Gateway's purported success was at least impliedly attributed to Gateway's "strong growth in sales to consumers," small business sales, and the beyond-the-box strategy, all of which were emphasized in public statements. However, Weitzen did not disclose that but for the unusual and large Lockheed and AOL transactions, Gateway would not have met analysts' revenue expectations, and would have been experiencing the same "troubling news" as others in the business.

**[17]** The fact that Gateway would not have met analysts' expectations without booking the unusual Lockheed and AOL transactions as revenue could lead a reasonable juror to find that Gateway's revenue was not growing "faster and faster" as a characteristic of accelerated growth. If Gateway had not met analysts' expectations or Weitzen had disclosed the true source of the revenue, the investing public would have been alerted to the lesser rate of growth for Gateway's traditional sources of revenue. Under the circumstances, a rational trier of fact could conclude that Weitzen omitted material information regarding the Lockheed and AOL transactions, which misled investors into believing that Gateway was experiencing a higher rate of growth based on its public business model than it was achieving in fact.

### 2. Scienter

**[18]** Based on the foregoing facts, a rational juror could conclude that Weitzen acted at least recklessly when he did

not disclose the unusual sources of revenue that enabled Gateway to meet analysts' revenue expectations. The record suggests that Weitzen knew that the Lockheed and AOL transactions were unusual, one-time events used to meet the quarterly revenue targets. The record further demonstrates that Weitzen understood that without the Lockheed and AOL transactions, Gateway would not meet the analysts' quarterly expectations. This is sufficient to create an issue of fact as to whether Weitzen at least acted recklessly (and thus with scienter) when he claimed that Gateway's financial growth was "accelerated."

**[19]** Accordingly, we conclude that there is a genuine issue of material fact as to whether Weitzen made material misrepresentations when he stated in a press release and in a conference call with analysts that Gateway was achieving "accelerated" growth while failing to disclose the unusual, significant sources of the revenue derived from the Lockheed and AOL transactions, and whether Weitzen acted with scienter. Thus, summary judgment was inappropriate on the Section 10(b) and Rule 10b-5 claims.

### B.  The Section 20(a) claim for control person liability

The SEC asserts that there are genuine issues of material fact as to whether Weitzen was a "control person" for purposes of finding liability under Section 20(a) of the Act, 15 U.S.C. § 78t(a). It also maintains that the district court erred in ruling that Weitzen met his burden of establishing a good-faith defense of relying on others, and that he did not induce fraud when he reported misleading information about Gateway's financial condition. We agree. We conclude that there is a genuine issue of material fact concerning Weitzen's control over Gateway. Moreover, because Weitzen substantially participated in the preparation of the press release, his knowledge that he misrepresented the nature of the one-time transactions vitiates his good-faith-reliance defense at the summary judgment stage of this litigation.

**[20]** The Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Accordingly, under Section 20(a), a defendant may be liable for securities violations if (1) there is a violation of the Act and (2) the defendant directly or indirectly controls any person liable for the violation. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).[4] The definition of "person" under the Act encompasses a "company," 15 U.S.C. § 78c(a)(9), rendering Gateway the violator at issue here, as discussed *supra*. However, even if a securities violation occurs, there is no liability if "the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation." 15 U.S.C. § 78t(a). The burden is on the defendant to show that both requirements of the good-faith exception are met. *Howard*, 228 F.3d at 1065 ("[A] defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation.").

When determining "control person" status, the issue is whether the defendant exercised power or control over the primary violator, and the plaintiff "need not show that the defendant was a culpable participant in the violation." *How-*

---

[4]The SEC defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

*ard*, 228 F.3d at 1065. "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994) (citation and internal quotation marks omitted). The fact that a person is a CEO or other high-ranking officer within a company does not create a presumption that he or she is a "controlling person." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996). Rather, indicia of "control" include whether the person managed the company on a day-to-day basis and was involved in the formulation of financial statements, which is sufficient to "presume control over the 'transactions giving rise to the alleged securities violation.' " *Howard*, 228 F.3d at 1065 (citing *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987)). Moreover, actual authority over the preparation and presentation to the public of financial statements is sufficient to demonstrate control. *Howard*, 228 F.3d at 1066.

**[21]** Here, there is sufficient evidence to create a genuine issue of fact as to whether Weitzen was properly considered a "control person" within the meaning of the statute. According to Gateway's bylaws, Weitzen, as president and CEO, had "general management and control of the business and the officers and the employees of the Company." He had day-to-day control of the company, and could veto any plan or strategy. He was responsible for Gateway's financial reporting. Weitzen also signed the management representation letter to PwC confirming the 10-Q report. Additionally, Weitzen substantially assisted in preparing the press release that reported the results from the third quarter, including the unusual Lockheed and AOL transactions.

**[22]** Moreover, Weitzen does not meet his burden of showing that he is entitled to a good-faith defense. To be eligible for the defense, Weitzen must demonstrate that he acted in good faith based on an absence of scienter, and did not "di-

rectly or indirectly induce the act or acts constituting the violation." 15 U.S.C. § 78t(a); *Paracor*, 96 F.3d at 1164. Here, there is a genuine issue of material fact as to whether Weitzen acted in good faith. As discussed *supra*, there is evidence that Weitzen acted with at least recklessness, or scienter, when he reported the Lockheed and AOL transactions as "accelerated growth." This precludes his ability to rely on the good-faith defense to defeat summary judgment.[5] *See Howard*, 228 F.3d at 1065.

We are further persuaded that there is a genuine issue of material fact whether Weitzen indirectly induced fraud, thereby precluding him from using the good-faith defense to defeat summary judgment. The SEC, relying on *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424 (9th Cir. 1995), argues that Weitzen induced fraud when he substantially participated in the press release that reported the unusual and one-time Lockheed and VenServ transactions. Under our case law, these facts are sufficient to vitiate Weitzen's defense at the summary judgment stage. In *Nordstrom*, we held that officers and directors could be liable under Section 20(a) when they authorized misleading public disclosures, press releases, and statements to the press that were allegedly fraudulent. *Id.* at 1434. We further concluded that the good-faith "defense is unavailable even when the defendants who induced the fraud believed in good faith that they were not perpetrating a fraud." *Id.* Here, not only is there evidence of Weitzen's scienter, but he engaged in disseminating misleading information to the public regarding Gateway's purported financial health in the third quarter of 2000.

**[23]** Accordingly, we conclude that there is a genuine issue of material fact as to whether Weitzen is a "control person" under Section 20(a), and that summary judgment on this claim

---

[5]As discussed below, the SEC fails point to any evidence in the record that Weitzen knew that there were accounting improprieties.

was inappropriate. We further conclude that Weitzen's good-faith defense fails at the summary judgment stage.

### C. The Rule 13b2-2 claim for improperly reporting to accountants

**[24]** The SEC argues that the district court erred by requiring that Weitzen know that the representation letter to PwC was false when he signed it. We disagree. As discussed above, to be directly liable for improperly reporting to accountants, Weitzen had to have knowledge that he was signing a false management representation letter to PwC. *See Goyal*, 629 F.3d at 916.

**[25]** Here, the SEC does not point to any evidence in the record that Weitzen knew that the revenue from any of the transactions was improperly booked. Accordingly, the SEC cannot demonstrate that Weitzen knew he was falsely signing the management representation letter sent to Gateway's outside auditors. Therefore, we conclude that the district court properly granted Weitzen's motion for summary judgment as to this claim.

### IV. Todd's and Manza's motions for judgment as a matter of law as to Sections 13(a) and 13(b)(2)(A) and Rule 13b2-1

Todd and Manza argue that the district court erred when it did not grant their motions for judgment as a matter of law as to the aiding and abetting claims under Sections 13(a), 13(b)(2)(A), and Rule 13b2-1. We disagree.

Sections 13(a) and (b) of the Act outline some of the financial reporting requirements for corporations that issue securities. 15 U.S.C. §§ 78m(a) (reporting provisions), 78m(b)(2)(A) (books and records provisions). The reporting requirements are enforced by Rule 13b2-1, which provides that "[n]o person shall directly or indirectly, falsify or cause

to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act." 17 C.F.R. § 240.13b2-1. To establish aiding and abetting liability under Section 13, the jury must have found that: (1) Gateway violated the relevant securities laws; (2) Todd and Manza had knowledge of the primary violation and of their own role in furthering it; and (3) Todd and Manza provided substantial assistance in the primary violation. *See Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003).

**[26]** The aiding and abetting claims against Todd and Manza relate to the Lockheed and VenServ transactions. Substantial evidence supports the jury's verdict. A jury could reasonably conclude that the Lockheed transaction was improperly recorded, and there is no dispute that there was accounting impropriety as to the VenServ transaction. Both were reported on the third-quarter 10-Q report. The misrepresentations were material because by including the transactions, Gateway was able to meet analysts' expectations for the third quarter of 2000. Furthermore, as noted previously, a jury could reasonably conclude that Todd and Manza acted at least recklessly when they recognized revenue from the Lockheed and VenServ transactions. Accordingly, there was substantial evidence supporting the jury's verdict on this claim, and the district court properly denied Todd's and Manza's motions for judgment as a matter of law. R. 59.

## V. Todd's and Manza's Motions for a New Trial

**[27]** A district court's decision concerning a motion for a new trial is reviewed for an abuse of discretion. *Pape Lift, Inc.*, 115 F.3d at 680. A motion for a new trial is granted if the verdict "is against the 'great weight' of the evidence, or 'it is quite clear that the jury has reached a seriously erroneous result.' " *Id.* (citation and internal quotation marks omitted). Here, the verdict is not against the great weight of the evidence. The SEC met its burden at trial and proffered sufficient evidence that Todd and Manza knowingly participated

in activities that misrepresented Gateway's financial health in 2000. The district court did not abuse its discretion in denying Todd's and Manza's motions for a new trial.

## CONCLUSION

For the foregoing reasons, we:

(1) REVERSE the district court's order granting, in part, Todd's and Manza's motions for judgment as a matter of law;

(2) REVERSE the district court's order granting Weitzen's motion for summary judgment as to the Section 10(b) and Rule 10b-5 violations;

(3) AFFIRM the district court's order granting Weitzen's motion for summary judgment as to the Rule 13b2-2 claim;

(4) AFFIRM the district court's order denying, in part, Todd's and Manza's motions for judgment as a matter of law on the aiding and abetting claims under Sections 13(a), 13(b)(2)(A), and Rule 13b2-1; and

(5) AFFIRM the district court's order denying Todd's and Manza's motions for a new trial.

Each party shall bear its own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**. .