Virginia C. MOON, on her own behalf and on behalf of the Peters Rush Habib & McKenna 401(k) Profit Sharing Plan, Plaintiff,

v.

David H. RUSH, Mark A. Habib, and James P. McKenna, Defendants.

and Related Counterclaim.

No. 2:11–CV–03102–GEB–CKD.

United States District Court,
E.D. California.

Signed Dec. 19, 2014.

Filed Dec. 22, 2014.

---

Nina R. Wasow, Teresa Renaker, Darin Daniel Ranahan, Lewis, Feinberg, Lee, Renake and Jackson P.C., Oakland, CA, for Plaintiff.

R. Bradford Huss, Sean Travis Strauss, Trucker Huss APC, San Francisco, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

GARLAND E. BURRELL, JR., Senior District Judge.

Plaintiff and Counter–Defendant Moon and Defendants Rush, Habib, and McKenna (collectively the "Defendants") each move for summary judgment on claims one through five in Plaintiff's Complaint ("Compl."). Defendants also seek summary judgment on the six remaining claims in the Complaint. Counter–Claimant Rush seeks summary judgment on all three claims in his Second Amended Counterclaim ("Countercl.").

## I. LEGAL STANDARD

A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A fact is 'material' when ... it could affect the outcome of the case." *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 322 F.3d 1039, 1046 (9th Cir.2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

If the movant satisfies its "initial burden," "the nonmoving party must set forth, by affidavit or as otherwise provided in Fed. Rule Civ. Proc. ("Rule") 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (quoting former Rule 56(e)). Summary judgment "evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Sec. & Exch. Comm'n v. Todd,* 642 F.3d 1207, 1215 (9th Cir.2011) (citing *Johnson v. Paradise Valley Unified Sch. Dist.,* 251 F.3d 1222, 1227 (9th Cir.2001)).

Further, Local Rule 260(b) prescribes:

Any party opposing a motion for summary judgment ... [must] reproduce the itemized facts in the [moving party's] Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial.

If the nonmovant does not "specifically ... [controvert duly supported] facts identified in the [movant's] statement of undisputed facts," the nonmovant "is deemed to have admitted the validity of the facts contained in the [movant's] statement." *Beard v. Banks,* 548 U.S. 521, 527, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006).

Because a district court has no independent duty "to scour the record in search of a genuine issue of triable fact," and may "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment," ... the district court ... [is] under no obligation to undertake a cumbersome review of the record on the [nonmoving party's] behalf.

*Simmons v. Navajo Cnty., Ariz.,* 609 F.3d 1011, 1017 (9th Cir.2010) (quoting *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996)).

## II. STATEMENT OF UNCONTROVERTED FACTS

The following uncontroverted facts concern the motions.

### A. The Marriage/Dissolution of Moon and Rush

Rush and Moon were married on March 21, 1977. (Pl. Resp. Defs. SUF ("Defs. SUF") ¶ 1, ECF No. 119.) Moon filed a petition in state family court for dissolution of the marriage in 1994. (Defs. SUF ¶ 14.) In connection with their divorce, Rush and Moon entered into a domestic relations order ("DRO") "which was intended to divide the marital community's assets in the [Peters, Rush, Habib & McKenna] 401(k) Profit Sharing Plan ("the Plan")." (Defs. SUF ¶ 19.) The DRO was signed and filed in September 1995, and the final dissolution was entered on September 26, 1995. (Defs. SUF ¶¶ 23, 18.)

Moon, through her family law counsel, served a copy of the DRO on Rush at his home address on October 31, 1995. (Defs. SUF ¶ 27.) Moon did not present the DRO to David Fuller, who was then the Plan Administrator. (Defs. SUF ¶¶ 33, 35.)

The Plan currently holds a 20.2881% interest in a 40–acre Property at 1525 Dayton Road in Chico, California ("the Property") "for Moon's benefit." (Defs. SUF ¶ 74.)

### B. The Plan

The Plan maintains separate accounts for each individual participant and/or beneficiary. (Defs. Resp. Pl. SUF ("Pl. SUF") ¶ 1, ECF No. 111.) Each participant and/or beneficiary of the Plan is permitted to direct the investments of the assets in his or her account. (Pl. SUF ¶ 2.)

Rush was a Discretionary Trustee of the Plan until January 1, 2013, at which time he became a Special Trustee. (Pl. SUF ¶ 3.) He has never been a Plan Administrator. (Defs. SUF ¶ 30.) Habib is the current Plan Administrator. (Pl. SUF ¶ 4.) McKenna is a Trustee of the Plan. (Pl. SUF ¶ 5.)

When Rush received the DRO from Moon in 1995, he did not share it with other Plan Trustees. (Pl. SUF ¶ 12.)

### C. The Property

Sometime in 1995 or 1996 after the divorce, Moon took over complete control of the Property. (Defs. SUF ¶ 56.) Moon personally held a 79.7119% interest in the Property and the Plan held a 20.2881% interest. (Defs. SUF ¶ 55.) In 1997 Rush loaned Moon $75,000, and they agreed Moon would sell Rush a 49% ownership interest in the Property with the loan used as partial payment. (Defs. SUF ¶¶ 75–76.) In 1998 or 1999, Rush became a partial

owner of the Property; he personally owned a 49% interest, Moon personally held a 30.7119% interest, and the Plan held a 20.2881% interest. (Defs. SUF ¶¶ 81–82.) Moon and Rush dispute the terms of their 49% ownership agreement. However, it is uncontroverted that Rush deposited income generated by the Property "into Moon's checking account in Chico." (Defs. SUF ¶ 88.) Moon transferred 2% of her personal ownership interest to Rush in January 2000, resulting in Rush having a 51% interest in the Property, Moon personally having a 28.7119% interest, and the Plan having a 20.2881% interest. (Defs. SUF ¶ 99.)

In early 2000, Rush told Moon she owed him 49% of the Property's "net" rental income "for calendar year 1999," which she paid. (Defs. SUF ¶ 94.) In 2002, he sent her an accounting statement through December 31, 2001, which Moon paid. In June 2003, Rush sent Moon an accounting for 2002, which she paid. (Defs. SUF ¶¶ 108–09.) Rush sent Moon accounting statements for 2003–2008. (Defs. SUF ¶¶ 116, 121, 126, 131, 137). Moon received the 2003–2008 statements, but did not pay Rush. (Defs. SUF ¶¶ 117, 119, 122, 124, 127, 129, 132, 135, 139, 141.)

From 2003 to mid–2009 Moon received 100% of the income generated by the Property; specifically, $225,500. (Defs. SUF ¶ 143.) "Although Moon received $225,500 in income from the Property from 2003 to mid–2009, Moon did not report on her federal income tax returns any income related to the Property for tax years 2003–2009." (Defs. SUF ¶ 144.) "Moon has never offered or made any effort to transmit any portion of the income she received from the Property from 2003 to mid–2009 to the Plan, despite her present argument that the Plan was entitled to receive some portion of this income." (Defs. SUF ¶ 145.) "From 2003 to 2008, although Rush claimed credit for mortgage interest and taxes paid by Moon, he also reported the entirety of all income earned from rental of the Property, even though he received none of it." (Defs. SUF ¶ 146.) "From 2003, when Moon began retaining all rents for the Property, through at least June 2009, Moon paid alarm monitoring and property tax expenses for the Property." (Defs. SUF ¶ 153.) Rush personally advanced expenses for the Property in 2003–2008. (Defs. SUF ¶¶ 118, 123, 128, 133, 134, 140.)

In June 2009, Rush began retaining rents received for the Property instead of depositing them into Moon's checking account, and since January 1, 2013, Rush has deposited all income from the Property into a segregated savings account. (Defs. SUF ¶¶ 152, 254.)

**D. Property Valuations Over Time**

In 1997, a realtor estimated the Property was worth between $800,000 and $850,000. (Defs. SUF ¶¶ 191–192.) In 2002, the appraised value of the Property was $1,150,000. (Defs. SUF ¶¶ 193–194.) In November 2003 an appraiser opined that the Property "was worth $2,600,000" based on the assumption of an extraordinary hypothetical condition that the property would not be impacted by the Green Line. (Defs. SUF ¶¶ 171, 173.) The Green Line is a boundary line in Chico outside of which development is restricted to protect agricultural lands. (Defs. SUF ¶ 175.) "Moon's expert witness ... stated that, 'According to the Chico City and Butte County planners, the likelihood of altering the Green Line at this location is very low.'" (Defs. SUF ¶ 176.)

In 2009, the Property was appraised at $850,000, and in 2014, different appraisers valued the Property: one at $500,000 and the other at $850,000. (Defs. SUF ¶¶ 199, 205, 216.)

### E. Moon's Requests for Plan Assets Information

Habib became the Plan Administrator in either 1996 or 1997. (Defs. SUF ¶ 36.) Moon did not provide him with a copy of the DRO until 2010. (Defs. SUF ¶ 38.)

On February 25, 2010, Moon's counsel wrote Habib requesting plan documents, including a pension benefit statement. (Defs. SUF ¶ 233.)

Habib acknowledged the letter on March 4, 2010. (Defs. SUF ¶ 242.) On April 10, 2010, Moon's counsel informed Habib that his thirty-day period to respond to her document request had expired, and counsel reiterated the request for documents. (Pl. SUF ¶ 23.)

On or around June 2, 2010, Habib informed Moon's counsel "that he was unable to provide any of the documents requested in the February 25, 2010 letter until he received a written authorization signed by Moon, which was not included with the February 25, 2010 letter." (Defs. SUF ¶ 243, Pl. SUF ¶ 24.) Moon provided written authorization through her counsel on June 16, 2010, and Habib provided the requested documents on June 22, 2010. (Defs. SUF ¶¶ 244–245.)

Prior to Habib's June 2010 request for Moon's written authorization to release the documents to her attorney, Moon had never received communication from the Plan about the DRO and had not been provided a pension benefit statement. (Pl. SUF ¶ 27; Defs. SUF ¶ 241.) Habib has not provided Moon with a pension benefit statement since his June 2010 communication. (Pl. SUF ¶ 29.)

In October 2011, Moon's attorney sent a letter to Habib requesting formal notice that the DRO had gone through the Plan's qualification process. Habib responded in November 2011 that the Plan did not consider the DRO qualified. (Defs. SUF ¶ 247–249.) The Plan first established procedures for qualifying a DRO in November 2011. (Pl. SUF ¶ 32.)

## III. DISCUSSION

### A. Qualification of Moon's DRO

Moon alleges in several of her claims that Defendants violated statutory duties owed to her under the Employee Retirement Income Security Act ("ERISA"), as a result of her alternate payee Plan beneficiary status and their status as fiduciaries of the Plan.

 Under ERISA a fiduciary owes duties to plan beneficiaries. See 29 U.S.C. § 1104(a)(1) (setting forth the fiduciary duties under ERISA, which include the duty to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use ..."). Further a plan "trustee is a fiduciary" under ERISA, *N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322, 334, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981), and "ERISA assigns to plan administrators the fiduciary duty to ensure that an alternate payee's rights are protected." *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1156 (9th Cir.2000). Rush, McKenna and Habib are Plan Trustees and Habib is also a Plan Administrator. (Pl. SUF ¶¶ 3–5.) Therefore, each Defendant owes a fiduciary duty to plan beneficiaries.

 ERISA "confers beneficiary status on a nonparticipant spouse ... in only narrow circumstances delineated by its provisions." *Boggs v. Boggs*, 520 U.S. 833, 846, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997). The ERISA statutory definition of "beneficiary" includes "[a] person who is an alternate payee under a qualified domestic relations order ["QDRO"]." 29 U.S.C. § 1056(d)(3)(J). "A QDRO is a subset of

'domestic relations orders' that recognizes the right of an alternate payee to receive all or a portion of the benefits payable with respect to a participant under the plan." *Hamilton v. Wash. State Plumbing & Pipefitting Indus. Pension Plan,* 433 F.3d 1091, 1096 (9th Cir.2006) (citation omitted). "The term 'alternate payee' means any ... former spouse ... of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan." 29 U.S.C. § 1056(d)(3)(K).

Further, Moon argues that the California Court of Appeal held in *In re Marriage of Rush,* C070841, 2014 WL 2795475 (Cal. Ct.App. June 20, 2014) (unpublished disposition) that the DRO is qualified and therefore, she is a beneficiary under the Plan.

Defendants counter that Moon has not established she a beneficiary under the Plan, and argue that "[n]either the September 26, 1995 domestic relations order nor the California Court of Appeals decision in *In re Marriage of Rush* establish that 'Moon is a beneficiary of the Plan.'" (Pl. SUF ¶ 11.)

■ Defendants' argument disregards the content of the DRO and the evident holding *In re Marriage of Rush.* The appellate court held in *In re Marriage of Rush* that the subject DRO is "presumptively qualified, subject only to modifications agreed upon by the parties or ordered by the court to save the DRO from being legally ineffective." *Id.* at *2.

Further, the context in which *In re Marriage of Rush* issued, indicates the decision rebuked Habib's attempt to avoid his obligations to Moon under the Plan. In December 2011, after Moon's counsel requested written confirmation from Plan Administrator Habib that Moon's DRO was qualified, Habib responded that it was not qualified and then intervened in the long dormant divorce proceedings between Moon and Rush seeking to have the state court determine if Moon's DRO was qualified. The state court held the DRO was not qualified "because it did 'not provide a basis for determining what is [Rush's] separate interest in the plan and what is the community interests.'" *Id.* at *3 (alterations in original). Moon appealed, and the Court of Appeal reversed in *In re Marriage of Rush,* holding the family court's "ruling on qualification was erroneous." *Id.* at *5–6. The Court of Appeal stated:

> The 'pivotal question' [in determining if a DRO is qualified] is whether the dissolution order contains enough information for the plan administrator to make an informed decision about distribution. Substantial compliance with the requirements is sufficient.

> Inclusion of the term "community interest" in the DRO does not render the DRO unqualified. The wording may create some ambiguity in this case, but not enough to render the plan unqualified at such a late date.

> Community property interests are those acquired during marriage. [Rush] declared that he could not distinguish contributions he made to the plan during his marriage to [Moon] from those he made beforehand. However, both [Rush] and Habib had access to the plan's records, including the dates and amounts for [Rush's] contributions to the plan. Neither claimed to have made an attempt to identify or trace [Rush's] separate property interest.

> Before the dissolution, [Rush] and [Moon] were required by law to disclose to one another and to the family court "[a]ll material facts and information regarding the characterization of all assets and liabilities." When parties divide pension assets, the party with better access to information about the assets

"must acquire and disclose such information to the other spouse." In this case, [Rush] necessarily had superior (and perhaps exclusive) access to information about his own pension assets, including the extent to which his pension fund's investment in the disputed real property was traceable to separate rather than community property. He had an affirmative duty to discover and disclose the facts to [Moon] before they dissolved their marriage and he offers no explanation for not disclosing the same facts to his law partner, the plan administrator, in order to identify and segregate any separate property interests. Tellingly, [Rush] did not ask the family court to characterize some or all of the disputed property interest as separate; he asked the family court to declare the order he had negotiated unqualified and ineffective.

*Id.* at *3–4 (citations omitted).

The appellate court also explained in *In re Marriage of Rush* that the Plan's challenge to Moon's status as a Plan beneficiary was untimely, stating:

If a plan administrator fails to timely object to a DRO, however, "it makes no sense to punish a spouse for a plan's dereliction." Rather, a DRO may be declared a QDRO based on the plan administrator's inaction. And the plan need not be a party to a dissolution proceeding to be bound by the terms of a QDRO.

The plan's request for a declaration that the DRO was not qualified-brought 16 years after [Rush] signed the DRO as a party and trustee, and 18 months after the plan administrator acknowledged it in writing-was unreasonable and untimely. . . .

. . . .

A QDRO does not create a new property interest, but renders enforceable an already existing interest, so the alternate payee's right to an enforceable QDRO is presumed during any period of DRO refinement. Here, the DRO was clearly intended by [Rush] and [Moon], and by the family court in 1995, to effectively transfer the entire community share of the disputed property to [Moon]. The family court's ruling on qualification was erroneous.

The family court order ... is reversed. *Id.* at *5–6 (emphasis and citations omitted).

It is evident that the state court DRO is a QDRO under ERISA and that the Plan Administrator's indication otherwise is not supported by the record. Further, Moon is an alternate payee under the QDRO and a Plan beneficiary within the meaning of 29 U.S.C. § 1056(d)(3)(K).

### B. Claims 1 and 2: Breach of Statutory Duty

#### 1. Claim 1: 29 U.S.C. § 1025(a)

Moon and Habib each seek summary judgment on claim one in Moon's Complaint, in which Moon alleges that as Plan Administrator Habib breached the statutory duty he owed her under ERISA 29 U.S.C. § 1025(a), which require him to provide her a pension benefit statement at least once each calendar quarter beginning January 1, 2007. Habib has only sent Moon one pension benefit statement for the second quarter of 2010. (Pl. SUF ¶¶ 27, 29; Defs. SUF ¶ 241.)

Section 1025(a) prescribes in part:

The administrator of an individual account plan ... shall furnish a pension benefit statement—

(i) at least once each calendar quarter to a participant or beneficiary who has the right to direct the investment of assets in his or her account under the plan

. . . .

It is uncontroverted that beneficiaries of the Plan are permitted to direct the investment of the assets in their own accounts. (Pl. SUF ¶ 2.) It is also uncontroverted that Habib has been the Plan Administrator since 2007; that prior to June 22, 2010 he never provided Moon with a pension benefit statement; and since June 22, 2010 he has not provided Moon with another pension benefit statement. (Defs. SUF ¶ 26; Pl. SUF ¶¶ 27–29.) Therefore, Moon has shown Plan Administrator Habib violated his statutory duty pursuant to § 1025(a).

### 2. Claim 2: 29 U.S.C. § 1024(b)(4)

Moon and Habib each seek summary judgment on claim two in Moon's Complaint, in which Moon alleges that as Plan Administrator Habib breached the statutory duty he owed her, ERISA under 29 U.S.C. § 1024(b)(4), which requires him to timely provide her requested plan documents. Section 1024(b)(4) provides that "[t]he administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1132(c)(1) requires a Plan Administrator to respond within thirty days of a written request or risk sanctions of up to $110 per day for delay.

Moon contends in her capacity as a Plan beneficiary she sent Habib a written request for plan documents dated February 25, 2010. Habib acknowledged receipt of the letter on March 4, 2010. (Defs. SUF ¶ 242.) Moon argues Habib "did not provide the [requested] documents until June 22, 2010." (Pl. Mot. 10:11.) Habib counters he has not violated § 1024(b)(4) because he provided Moon copies of the requested documents eight days after Moon

sent him, through her attorney, written authorization to release the requested documents to her attorney. (Defs. Unsealed Notice & Mot. Summ. J. ("Defs. Mot.") 8:15–17, ECF No. 107.) Habib contends his obligation to respond to Moon's document request did not commence until he received a written authorization from Moon authorizing her attorney to receive the documents on her behalf.

■ A Plan Administrator is not "obliged to disclose any documents to [a Plaintiff's] attorney without written authorization from" the beneficiary. *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1072 (6th Cir.1994). However:

> a [P]lan [A]dministrator is not entitled to ignore a request for pension benefits information made by an attorney on behalf of a participant ... Instead, a [P]lan [A]dministrator must either provide the requested information to the plan beneficiary ... or must ... inform the attorney that the information will be released upon the receipt of an authorization signed by the plan participant. A [P]lan [A]dministrator who fails to take either of these steps within the thirty day period imposed by 29 U.S.C. § 1132(c) is subject to the fines authorized by that same provision, at the discretion of the district court.

*Minadeo v. ICI Paints*, 398 F.3d 751, 758 (6th Cir.2005).

■ Since it is uncontroverted that Habib received Moon's February 25, 2010 plan document request by March 4, 2010, he had an obligation to respond within thirty days, by either providing the requested documents to Moon or informing Moon's attorney that the documents would only be released upon receipt of written authorization from Moon. He did neither. (Defs. SUF ¶ 244.) Habib did not provide Moon with the documents until well be-

yond the thirty day statutory period within which he was required to respond. Therefore, Moon has shown Habib violated § 1024(b)(4).

### 3. Statutory Penalties

■■■ An administrator who fails to comply with his duties under either section 1025(a) or section 1024(b), "may in the court's discretion be personally liable" to the requesting beneficiary for statutory penalties. 29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502c–1 (increasing the maximum statutory penalty from $100 per day to $110 per day for violations occurring after July 29, 1997). "Whether to impose statutory penalties and the amount of those penalties (up to $110 a day) is discretionary." *Hemphill v. Estate of Ryskamp*, 619 F.Supp.2d 954, 975 (E.D.Cal.2008). "Appropriate factors to be considered ... include [1] bad faith or intentional misconduct on the part of the administrator, [2] the length of the delay, [3] the number of requests made and documents withheld, and [4] the existence of any prejudice to the participant or beneficiary." *Hemphill*, at 976 (citing *Romero v. SmithKline Beecham*, 309 F.3d 113, 120 (3d Cir.2002)); *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 848 (2nd Cir.2013) (same). Section 1132 penalties are "meant to be in the nature of punitive damages, designed more for the purpose of punishing the violator than compensating the participant or beneficiary." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1232 (11th Cir.2002); *see also Starr v. Metro Sys., Inc.*, 461 F.3d 1036, 1040 (8th Cir.2006) ("The purpose of [ERISA's statutory penalties] is to provide plan administrators with an incentive to comply with the requirements of ERISA ... and to punish noncompliance.").

#### a. Penalties for Claim One

Moon seeks the maximum statutory penalty under § 1025(a) for every day in each calendar quarter in which Habib failed to provide her with a pension benefit statement from January 1, 2007 through the first quarter of 2010, and from the third quarter of 2010 to the present.

#### 1. Bad Faith or Intentional Misconduct

Plan Administrator Habib argues his failure to provide Moon a pension benefit statement was not because of bad faith or intentional misconduct, since he was not the Plan Administrator when Moon's DRO was signed and he did not have knowledge of the DRO until 2010.

Moon argues Habib's lack of knowledge about the "QDRO prior to 2010" does not prevent a finding that he acted in bad faith for failing to provide her quarterly pension benefit statements because he "knew about Mr. Rush's divorce from Ms. Moon, and was aware for years that both the Plan and Ms. Moon individually owned interests in the ... [P]roperty, but never asked Mr. Rush or anyone else whether any Plan assets were involved in the divorce settlement or whether the divorce affected the Plan in any way." (Pl. Mot. 12:11–16.) Moon also argues that Habib's bad faith is evidenced by his refusal to provide her quarterly pension benefit statements even after the California appellate court ruled that the DRO is qualified.

■■■ Moon has not shown that Habib's failure to provide her with quarterly pension benefit statements before his receipt of Moon's February 25, 2010 letter demonstrates that his failure stemmed from bad faith or intentional misconduct. However, Habib did not begin sending Moon quarterly pension benefit statements after he received the February 25, 2010 letter from Moon's counsel. This failure continued even after the California appellate court made clear in *In re Marriage of Rush*, C070841, 2014 WL 2795475, at *2, on June

20, 2014 that Moon is a beneficiary of the Plan pursuant to the DRO which "is presumptively qualified". Therefore, Moon has shown that Habib acted in bad faith or committed intentional misconduct when he failed to provide her quarterly pension benefit statements after receiving the February 25, 2010 communication.

### 2. Length of Delay

Moon argues Habib continues to violate § 1025(a) because he has not provided her with a quarterly pension benefit statement since June 2010, and she is entitled to one each calendar quarter. (Pl. SUF ¶ 29.) Habib failed to respond to this argument. Therefore, Habib's delay in providing Moon with quarterly pension benefit statements is ongoing since he has not provided Moon with a quarterly pension benefit statement since June 2010 and his ongoing violation weighs in favor of imposing a penalty.

### 3. Number of Requests

Habib argues Moon's single request for a pension benefit statement weighs against imposing a penalty. Moon counters that unlike her written request for plan documents, ERISA does not require her to request pension benefit statements before Habib's obligation to provide them to her is triggered.

### 4. Prejudice

Habib argues Moon suffered no prejudice as a result of his failure to timely provide her with quarterly benefit statements, contending that from the time she and Rush signed the DRO in 1995 until 2009, she received 100% of the income attributable to the Plan under the DRO; and, therefore even if had been alerted to the dispute regarding her ownership in the Plan's interest in the Property she could not have received additional income from the Plan. Habib also argues any prejudice Moon claims to have suffered is due to her own inaction rather than his breach since she failed to communicate with the Plan Administrator for fifteen years after the DRO was entered.

Moon contends she "has invested years and many thousands of dollars in attorney's fees in trying to obtain a clear statement of her interest in the Plan, and since Defendants have repudiated the Pension Benefits Statement, she still does not even have one." (Pl. Mot., 11:8–10, ECF No. 97.) Moon further argues: "If she had been provided with complete and accurate quarterly statements as she should have been, she would have known since at least 2006 that there was a dispute as to her ownership of the Plan's interest in the . . . [P]roperty, because the statement would have had to indicate the value of her portion (as opposed to Rush's asserted separate property portion)." (Pl. Mot. 11:10–14.) She also argues she was "hampered in her ability to pursue fiduciary breach claims based on Defendants' administration of the Plan and Rush's self-dealing with respect to the Property because she had no idea there was any issue with the QDRO's allocation of the Plan's interest in the Property to her" as a result of Habib's failure to perform his duties as Plan Administrator. (Pl. Reply ISO Mot. Summ. J. ("Pl. Mot. Reply,") 8:6–9, ECF No. 120.)

Moon also submits a declaration in which she declares that she "did not know before 2011 that Mr. Rush believe[d] that he has a separate property interest in the Plan's share of the [Property] or that there was any problem with the QDRO." (Decl. Moon ISO Opp'n Countercl. Rush's MSJ ¶ 14, ECF No. 117.)

Moon has shown she is still deprived of quarterly pension benefit statements. Although it is unclear whether she has suffered prejudice as a result of Habib's ERISA statutory violations, a lack of prej-

udice does not exonerate Habib's failure to timely provide Moon with Plan documents. *Godwin v. Sun Life Assur. Co. of Canada,* 980 F.2d 323, 327 (5th Cir.1992) ("section 1132 does not require the claimant to show he was prejudiced to be entitled to penalties"); *Kaiser Permanente Emp. Pension Plan v. Bertozzi,* 849 F.Supp. 692, 702 (N.D.Cal.1994) ("Although prejudice is not required to prevail on a section 1132(c) penalty claim, most courts do inquire as to whether the claimant has suffered some type of prejudice before exercising the discretion vested in them under section 1132(c).").

Considering the factors involved with the statutory penalty decision, Moon's motion for statutory penalties is granted and Habib's motion is denied. Habib is ordered to pay Moon $20 a day for his failure to provide Moon with pension benefit statements for two quarters in 2010 beginning on July 1, 2010 and until the date this order issues. *See Treadwell v. Schweiker,* 698 F.2d 137, 138 n. 1 (2d Cir.1983) (finding a calendar quarter to mean the period of three months ending on March 31, June 30, September 30, or December 31).

### b. Penalties for Claim Two

■ Moon also seeks the maximum statutory penalty under § 1024(b)(4) for each of the eighty-seven days that Habib delayed in providing her the requested plan documents, arguing the penalty should be calculated from the date her counsel mailed Habib a request for Plan documents, February 25, 2010.

### 1. Bad Faith or Intentional Misconduct

Habib argues he did not engage in any conduct that could be characterized as bad faith, and timely responded to Moon's inquiry and request; and that he did not know about Moon's DRO until 2010.

Moon argues Habib acted in bad faith when he failed to timely provide her with the documents she requested since "if Mr. Habib was actually concerned about an unauthorized request for information, he could have sent documents directly to Ms. Moon" rather than to her counsel and because he did not, "[h]is delay is indicative of bad faith." (Pl. Mot. 13:15–17.)

Moon has not shown that Habib's decision to communicate with Moon through counsel rather than directly evinces bad faith or intentional misconduct.

### 2. Length of Delay

Habib argues his delay in providing Moon the requested Plan documents was reasonable under the circumstances since Moon did not provide him with written authorization that he could release the Plan documents to her counsel until June 16, 2010, and he sent her the documents eight days after that authorization was received. (Defs. SUF ¶ 244–45.) Habib also argues his delay was caused by Moon's counsel since when Habib contacted her to discuss the matter in May 2010, she did not respond. (ECF No. 100–20.)

Moon rejoins that Habib cannot justify his delay by focusing on the date Moon provided him with written authorization to release the documents because Habib did not communicate his need for Moon's written authorization until at least three months after her initial request.

Habib's explanation for his delay in waiting until June 2010 to respond to Moon's request for Plan documents in her February 25, 2010 letter is not in compliance with § 1024(b). Although Habib argues Moon did not provide him with written authorization justifying release of the documents to her counsel until June 16, 2010, Habib did not request Moon's written authorization until earlier that month. (Def. SUF ¶¶ 244–245.) Habib has shown that e-mail communications with Moon's

counsel evince that Moon's counsel was not immediately responsive to his attempts to speak with her. However, the e-mails contain nothing about Moon's written authorization being required before the requested documents would be provided. (Wasow Decl. MSJ Ex. 20, ("May 31 E-mail") ECF No. 100–20) (e-mail communication between Moon's counsel and Habib).

### 3. Number of Requests

Habib argues Moon's single request for Plan documents weighs against imposing a penalty. Moon counters that in addition to the request in her February 25, 2010 letter, her counsel also told Habib on April 19, 2010 and June 1, 2010 that Habib had not responded to the request in the February 25, 2010 letter. (ECF Nos. 100–17, 100–19, 100–21.)

### 4. Prejudice

Moon has not shown that she was prejudiced by Habib's delay in responding to her document request.

Considering the factors involved with the statutory penalty decision, Moon's motion for statutory penalties is granted and Habib motions is denied. Habib is ordered to pay $30 a day for each of the eighty days he violated 29 U.S.C. § 1024 from when he sent notice to Moon's counsel that he had received her request for documents on March 4, 2010 until he provided the documents on June 22, 2010. (Defs. SUF ¶¶ 241, 245.)

### C. Claims 3–7: Prohibited or Conflict of Interest Transactions; Breach of Fiduciary Duty

Moon seeks summary judgment on claims three through five. Rush seeks summary judgment on claims three through seven, and Defendants Habib and McKenna seek summary judgment on claims five and six. Moon alleges in claims three through seven that certain Defendants, in their capacity as a Plan Trustee, breached one or more fiduciary duties owed to the Plan.

### 1. Application of 29 U.S.C. § 1113

Defendants argue claims three through seven are barred by the limitations periods prescribed in 29 U.S.C. § 1113 are "to the extent they rely on any events that occurred earlier than (1) October 28, 2004, if Moon had no knowledge of the underlying events, or (2) October 28, 2007, if she had such knowledge." ("Defs. Mot." 11:8–11.)

29 U.S.C. § 1113 prescribes:

No action may be commenced . . . with respect to a fiduciary's breach of any responsibility, duty, or obligation . . . after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation; except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

### a. Claims Three, Four and Seven Alleging Rush Breached His Fiduciary Duties as a Plan Trustee

The third, fourth, and seventh claims in the Complaint concern Rush's dual role as a Trustee of the Plan and a part owner of the Property in his individual capacity. Moon alleges while in this dual role Rush breached his fiduciary duties as Plan Trustee by entering agreements "for the payment of rent to him[self] on Plan property, . . . failing to transmit the Plan's share of the rents to the Plan," "making decisions regarding

leasing, maintaining and selling the [Property]," and "placing himself in a conflicted position with respect to the Plan ... by taking for himself rents and tax benefits attributable to the Property owned by the Plan." (Compl. ¶¶ 69, 74, 91.)

Rush purchased and has maintained an individual interest in the Property since 1999. (Pl. SUF ¶ 14.) Moon testified during her deposition that Rush is at least partially responsible for managing the Property and collecting rents from the tenants. (Huss Decl. Ex. 2 ("Moon Dep. Tr.") 96:11–16, ECF NO. 90–2.) Rush testified during his deposition that Moon is not always involved with the decisions he made regarding the Property. (Wasow Decl. Opp'n, Ex. 2 (Dep. David Rush) 210:6–23.) Neither party provides evidence demonstrating precisely when Rush allegedly engaged in the asserted prohibited transactions.

Disputed evidence precludes deciding precisely whether or when Moon had actual knowledge of the asserted violations and when was the "latest date on which [Rush] could have cured the breach or violation." 29 U.S.C. § 1113. Therefore, Moon's motion on claims three and four and Rush's time barred motion on claims three, four and seven are denied.

### b. Claims Five and Six

Moon alleges in her fifth claim that in violation of Defendants' fiduciary duties imposed by ERISA Defendants "failed to ensure that the Plan made a determination as to qualification [of Moon's DRO], [failed to] notif[y] Ms. Moon of such determination within a reasonable period of time, [failed to] segregate[ ] the assets allocated to Ms. Moon in a separate account, or provide[ ] her with an initial accounting or periodic statement of account" and "fail[ed] to properly establish written procedures to determine the qualified status

of the QDRO and inform Ms. Moon ... of these procedures." (Compl. ¶¶ 80–81).

Moon alleges in her sixth claim that Defendants "breached their [fiduciary] duties as Trustees ... by ... failing to investigate, oversee, and account for the Plan's investment ... in the [Property]." (Compl. ¶ 87.)

Here too disputed evidence precludes deciding precisely whether or when Moon had actual of the asserted violations and when was the "latest date on which [Defendants] could have cured the breach or violation." 29 U.S.C. § 1113. Therefore, each motion is denied.

### 2. Claims 3, 4 and 7 Concerning Whether Rush Breached His Fiduciary Duties to the Plan

Rush seeks summary judgment on claims three, four and seven, in which Moon alleges he breached his fiduciary duties to the Plan, arguing "discovery ... reveal[s] ... no basis in fact" to support the claims. (Defs. Mot. 15:19–20.)

■■■ Moon counters that the facts show Rush made unilateral decisions regarding the sale and management of the Property at a time when he was acting in a dual capacity as Plan fiduciary and individual owner of an interest in the Property, which violated his fiduciary duties to the Plan. (Pl. Opp'n Defs. Mot. Summ. J. ("Defs. Mot. Opp'n") 22:23–24, ECF No. 115.)

ERISA requires that a fiduciary "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1). ERISA further requires that "[a] fiduciary with respect to a plan shall not ... deal with the assets of the plan in his own interest or for his own account." *Id.* § 1106(b).

However, disputed factual issues concerning whether Rush's actions breached his fiduciary duties preclude decision on the motion. Therefore, Rush's motion on these claims is denied.

### 3. Claim 5 Concerning Whether Defendants Breached Their Fiduciary Duties to the Plan

Defendants seek summary judgment on Moon's fifth claim in which she alleges they failed to establish written procedures to determine if her DRO was qualified in violation of 29 U.S.C. 1056(d)(3).

#### a. McKenna

Defendant McKenna argues he is entitled to summary judgment because Moon has alleged "no facts or evidence" regarding his involvement. (Defs. Mot. 122:12–13.)

Moon did not counter McKenna's showing that the record is devoid of facts to support the claim against him with "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (quoting former Rule 56(e)). Therefore, McKenna's summary judgment motion is granted on claim five.

#### b. Rush and Habib

Rush and Habib argue they cannot be held liable for failing in 1995 "to properly establish written procedures to determine the qualified status of the QDRO and [and for failing to] inform Ms. Moon ... of these procedures" since they had no obligation to do these things until Moon presented the QDRO to the Plan Administrator in 2010.

Moon counters that under the terms of the QDRO, presenting it to Rush was sufficient to trigger Rush's and Habib's obligations to her. Moon argues it is uncontroverted both that she mailed the QDRO to Rush in 1995 and that the Plan did not establish written procedures to determine

whether a domestic relation order is qualified until fifteen years later.

▮ "Upon obtaining a domestic relations order in a state court proceeding, an alternate payee who seeks to establish a right to payment ... must present the order to the pension plan administrator for determination of whether it is a QDRO." *Trs. of Dirs. Guild of Am.–Producer Pension Benenfits Plans v. Tise*, 234 F.3d 415, 420 (9th Cir.2000).

During their divorce proceeding Moon and Rush signed a DRO designed to divide their community assets in the Plan. (Defs. SUF ¶ 20.) Moon's family law counsel drafted the DRO, which states in part: "The undersigned parties and/or fully authorized agents agree ... that the parties *including claimant plan* ... shall be bound by the following orders of the court." (Wasow Decl. MSJ, Ex. 8, ("DRO") ECF No. 100–8.) (emphasis added). At the time Moon and Rush signed the DRO, Rush was a Trustee of the Plan. (Pl. SUF ¶ 3.) The DRO also contains a "Notice/Identification" section detailing how each party: Rush, Moon and the Plan, was to receive notices relating to the DRO. In the notice section, Rush made a handwritten interlineation to the draft Moon's family law counsel prepared. (Wasow Decl. MSJ, ("DRO") Ex. 8 ("DRO"), ECF No. 100–8.) The draft includes the following information about the Plan's contact information: "Name: Peters et al. Profit Sharing Plan f/b/o David H. Rush c/o Administrator: David H. Rush Address: 414 Salem Street, Chico, California." (*Id.*) In the signed copy, Rush crossed out the word "Administrator" and wrote "Trustee" in its place. (*Id.*) Moon mailed a copy of the DRO to Rush's home address, 635 Paseo Companeros, Chico, CA, 95926 in 1995. (Defs. SUF ¶ 27.) Rush received the DRO, but did not share it with any other Plan Trustee or the then-Plan Ad-

ministrator David Fuller. (Defs. SUF ¶ 33; Pl. SUF ¶ 12.)

■ Since Rush altered the DRO to indicate that he was a Plan Trustee, but left his name as the person to receive notices on behalf of the Plan, when he signed the DRO he authorized Moon to send notice to the Plan through him. It is uncontroverted that Moon sent Rush a copy of the DRO to his home address in 1995. (Defs. SUF ¶ 27.) Defendants' argument that service on Rush was improper because it was sent to his home address rather than his work address as listed in the DRO is unsupported by authority.

■ Habib argues that if the Plan received notice of the QDRO when Moon mailed it to Rush in 1995, then he cannot be held liable for the Plan's failure to qualify the DRO at that time since he was not yet a Plan fiduciary. ERISA prescribes that "no fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary." 29 U.S.C. § 1109(b). It is undisputed that Moon served a copy of the QDRO on Rush in 1995 and that in 1995 Habib was not yet Plan Administrator. (Defs. SUF ¶¶ 27, 36.) Therefore, Habib cannot be liable for a failure to act in 1995 because ERISA does not make him liable for breaches that preceded his role as a fiduciary. Accordingly, Habib's motion for summary judgment on claim five is granted and Moon's motion for summary judgment against Habib on claim five is denied.

■ Rush argues that he cannot be held liable for claim five because he has never been a Plan Administrator. Moon acknowledges in her motion that the provisions of ERISA she alleges Rush violated in claim five, 29 U.S.C. § 1056(d)(3)(G)–(H) imposes "duties ... on *pension plan administrators.*" (Pl. Mot. 13:28) (emphasis

added). However, Moon counters that even though Rush was never a Plan Administrator, the Ninth Circuit's precedent in *Stewart* permits liability against him for violating section 1056(d)(3). Moon contends in *Stewart,* the court imposed section 1056(d)(3) liability on an ex-spouse who received notice of a DRO when the ex-spouse was a Plan Trustee as Rush is here.

Rush replies that *Stewart* does not create liability against an ex-spouse who is not a Plan Administrator, and that the ex-spouse in *Stewart* was both a Trustee *and* Plan Administrator.

Moon has not shown that *Stewart* authorizes liability against Rush for failing to perform a Plan Administrator's duties about which she complains. *Stewart* concerned the function of a Plan Administrator. *Stewart,* 207 F.3d at 1143 (holding that each member of the plan's committee of plan administrator's had constructive notice of the DRO once plaintiff provided it to her husband who was both a trustee and member of the committee of plan administrators). The handwritten changes Rush made on the DRO clarified his status where he crossed out the word "Administrator" next to his name and replaced it with "Trustee." (Wasow Decl. MSJ, Ex. 8 ("DRO"), ECF No. 100–8.) Therefore, Rush's motion for summary judgment on claim five is granted.

#### 4. Claim 6 Concerning Whether Defendants Breached Their Fiduciary Duties to the Plan

Defendants seek summary judgment on Moon's sixth claim in which Moon alleges they failed "to investigate, oversee, and account for the Plan's investment[ ] [in the Property,]" arguing Moon lacks credible evidence demonstrating the value of the Property decreased between 2003 and 2009, and any alleged decrease in value

cannot be linked to the Defendants. (Defs. Mot. 19:15–20:19.)

Moon counters that appraisals of the Property demonstrate a genuine issue as to whether the Property's value decreased and that "Defendants have not demonstrated the absence of any triable issues concerning their management and administration of the Plan, nor have they shown by undisputed facts that the Property has not suffered a diminution in value as a result of their imprudent behavior." (Defs. Mot. Opp'n 25:6–8.)

■■■ A fiduciary's "duties are 'the highest known to law' " and "[t]o enforce them, [a] court focuses on not only the merits of the transaction, but also the thoroughness of the investigation into the merits of the transaction." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir.1996). Each Defendant owed the Plan a fiduciary duty.

■■■ Moon opposes the motion with evidence showing that disputed facts preclude summary judgment. Moon submits the following testimony on the issue of whether each Defendant performed his fiduciary duties to the Plan by properly investigating and evaluating the Plan's investment in the Property. Rush gave deposition testimony that he did not know anything about fiduciary obligations imposed by ERISA; Habib gave deposition testimony that he did not recall the Property ever being discussed at a meeting of the trustees; and McKenna's gave deposition testimony that indicating he is not familiar with the Plan and its administration. (Wasow Decl. Opp'n, Ex. 2 (Dep. David Rush,) 40:11–13, ECF No. 116-2; Ex. 7 (Dep. Mark Habib,) 114:13–15, ECF No. 116-7; Ex. 10 (Dep. James McKenna,) 25:9–19; 29:4–17; 36:7–21; 55:9–16, ECF No. 116-10.)

It is uncontroverted that over time, appraisals of the Property's value have decreased. The Property was valued at $2,600,000 in 2003 and $850,000 in 2009 (Defs. SUF ¶¶ 173, 199.) These appraisals and the Defendants' referenced deposition testimony about the degree of care they used in investigating and evaluating the Plan's investment in the Property preclude summary judgment on this claim. Therefore, Defendants' motion for summary judgment on claim six is denied.

## D. Claims 8 and 9: Accounting and Conversion; Rush's Counter–Claims for Accounting; Breach of Oral and/or Implied in Fact Contract; and Account Stated

Rush seeks summary judgment on Moon's accounting and conversion claims (eight and nine) in which Moon alleges since 2009, Rush has wrongfully withheld from her and the Plan income he obtained from the Property. These claims depend on the terms of the Property income agreement between Rush and Moon. Rush's counterclaims for accounting, breach of oral/and or implied in fact contract and accounts stated are also based on the terms of the Property income agreement.

Rush argues "he and Moon agreed to split income and expenses associated with [the Property] in proportion to their ownership interests." (Counter Cl. Mot. 6: 17–20, ECF No. 99.) Moon gave deposition testimony that under the Property income agreement, Rush deposited all rents from the Property into Moon's bank account, and she was entitled to retain all the rental income. (Defs. SUF ¶¶ 88–89; Wasow Decl. Opp'n, Ex 1 (Dep. Virginia Moon,) 94:16–23, 109:11–110:3, ECF No. 116-1.) Rush rejoins the Property income agreement Moon describes is not supported by "documentary evidence and [the] behavior of the parties." (Defs. Mot. 21:20–22.)

Moon's deposition testimony and Rush's conduct create a genuine issue of material fact regarding the terms of the Property income agreement. Therefore, Rush's summary judgment motion on Moon's accounting and conversion claims and his counterclaims is denied.

Rush also argues his motion on Moon's accounting and conversion claims and each of his counterclaims should be granted, because the Property income agreement Moon testified to in her deposition amounts to "federal income tax fraud," making it legally unenforceable. (Defs. Mot. 21:17–21, 23:10–12.) Moon testified that under the terms of their agreement, although she was entitled to retain all income from the Property, she was not required to report any of it on her tax returns. (Defs. SUF ¶¶ 88–89, 93.) Rush argues such an agreement is legally unenforceable, and when a court is faced with an unenforceable agreement like the one Moon describes, it should "apply the[ ] legal default," which would require "cotenants [to] share the rental income received ... in accordance with their proportionate undivided interests." (Defs. Mot. 23:27–24:13.)

Rush does not support this argument with binding authority. He does not cite any supporting state law and the Ninth Circuit language he does cite is dicta. (Defs. Mot. 24:4–13.) Therefore, Rush has not shown the argument is suitable for summary judgment.

For the stated reasons, Rush's motion for summary judgment on Moon's accounting and conversion claims and his counterclaims for accounting, breach of oral and/or implied in fact contract and account stated is denied.

### E. Claim 10: Waste

Rush seeks summary judgment on Moon's tenth claim for waste in which Moon alleges: "[u]nder Mr. Rush's negligent property management, and as a result of Mr. Rush's tenant selection and failure to care for the residence on the property ... the appraised value of the ... [Property] decreased from $2.6 million to $850,000." (Compl. ¶ 106). Rush argues that although Moon alleges Rush caused the Property value to depreciate, she has not demonstrated the "actual fair market valuation of the Property" or that "the decrease in [the Property's] value [is attributable] to Rush." (Defs. Mot. 24:19–21, 25:3–5.)

Moon counters with an appraiser's report showing that at a time when Rush was involved in maintaining the Property, it fell into such disrepair that "it would not be financially feasible to rehabilitate" it because the cost of repair could not be recaptured even if the Property was sold. (Huss Decl. MSJ, Ex 52 (Johnson Appraisal Report) at 35, ECF No. 93–1; Wasow Decl. Opp'n, Ex. 2 (Dep. David Rush,) 24:1–8, ECF No. 116–2.)

Rush replies that the referenced appraiser's report is based "on an 'extraordinary' hypothetical condition," that "has never occurred and is highly unlikely to occur ...." (Defs. Mot. 20:1–7.)

In California, "[w]aste is a tort actionable for the protection of an owner of an interest in land." *Cal. Dep't. of Toxic Substances Control v. Payless Cleaners, College Cleaners*, 368 F.Supp.2d 1069, 1082 (E.D.Cal.2005); *see also* Cal. Civ.Code § 732. Waste includes "conduct, by both commission and omission, on the part of the person in possession of the property which impairs the value of the lender's security." *Evans v. Cal. Trailer Court, Inc.*, 28 Cal.App.4th 540, 553, 33 Cal. Rptr.2d 646 (1994).

The appraisal report on which Moon relies could support drawing a rea-

sonable inference that the Property's value decreased during the period Rush managed it. (Huss Decl. MSJ, Ex 52 (Johnson Appraisal Report) at 35, ECF No. 93–1; Wasow Decl. Opp'n, Ex. 2 (Dep. David Rush,) 24:1–8, ECF No. 116–2.) Although Rush challenges the credibility of this appraisal, "[c]redibility determinations … [are a] jury function[ ], not [the function of] of a judge, whether ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

Therefore, Rush's summary judgment motion on Moon's waste claim is denied.

### F. Claim 11: Declaratory Relief

Defendants seek summary judgment on Moon's declaratory relief claim in which she requests "a declaration from the Court that [she] is a beneficiary under the Plan and is entitled to a segregated account within the Plan." Defendants argue Moon fails to show she would benefit from declaratory relief since she "has always personally received the benefit of the income from the Plan's ownership interest in the Property." (Defs. Mot. 25:12–14.)

However, Moon provides evidence that she has not received any income from the Property in her individual capacity or in her capacity as the Plan beneficiary since 2009. (Pl. SUF ¶ 20.) Therefore, Defendants' summary judgment motion is denied.

### G. Moon's Statute of Limitations Defense against Rush's Accounting Counterclaim

Rush seeks summary judgment on Moon's statute of limitations defense asserted against his accounting counterclaim. Moon asserts Rush's accounting counterclaim is time-barred because she ceased reimbursing him for Property expenses in 2003, yet Rush did not raise his accounting counterclaim until well after the statute of limitations expired.

Rush counters that the statute of limitations on this claim did not begin running when Moon ceased reimbursing him in 2003 because, at that time, Moon continued to perform additional obligations under the agreement by paying property taxes and alarm monitoring expenses on the Property. Rush argues because Moon continued to perform some of her contractual obligations, the waiver of breach doctrine permitted Rush to "treat the contract as still alive" by performing his obligations until he decided to treat the contract as breached and ceased performing his own obligations. Rush asserts he treated the contract as breached in 2009 when he stopped depositing the Property's rental income into Moon's account. Rush contends, therefore, the statute of limitations on his accounting counterclaim began to run in 2009 when he failed to remit the rental income to Moon; and thus, his claim was still timely when the parties entered into a tolling agreement in 2010. (Counter Cl. Mot. 9:11–13.)

Moon replies that her agreement to pay property taxes and alarm monitoring expenses on the Property was a separate agreement from the Property income agreement and, therefore, California law did not entitle Rush to "treat the contract as still alive" when she ceased reimbursing him for expenses in 2003.

In California, "when there are ongoing contractual obligations [under an agreement and one party ceases to perform some of his or her contractual obligations,] the [other party to the agreement] may elect to rely on the contract despite a breach, and the statute of limitations does not begin to run until [that party] has elected to treat the breach as terminating the contract." *Romano v.*

*Rockwell Internat., Inc.,* 14 Cal.4th 479, 489, 59 Cal.Rptr.2d 20, 926 P.2d 1114 (1996) (citing 1 Witkin, Summary of Cal. Law, (9th ed.1987), Contracts, §§ 800–801, pp. 723–724).

Disputed factual issues exists on the question whether Moon's agreement to pay property taxes and alarm monitoring expenses was part of the Property income agreement or part of a second subsequent agreement that preclude granting the motion. Therefore, Rush's summary judgment motion is denied on this issue.

## IV. CONCLUSION

For the stated reasons, Plaintiff's summary judgment motion is GRANTED IN PART and DENIED IN PART; Defendants' summary judgment motion is GRANTED IN PART and DENIED IN PART; and Counter-claimant's summary judgment motion is DENIED.